186 U.S. 320 (1902)
INTERSTATE COMMERCE COMMISSION
v.
CHICAGO, BURLINGTON AND QUINCY RAILROAD COMPANY.
No. 154.
Supreme Court of United States.
Argued November 7, 8, 1901.
Decided June 2, 1902.
APPEAL FROM THE COURT OF APPEALS FOR THE SEVENTH CIRCUIT.
Mr. William A. Day, Mr. S.H. Cowan and Mr. David Willcox for appellant. Mr. James M. Beck was on their brief.
Mr. Lloyd Bowers for appellees. Mr. Frank B. Kellogg and Mr. Robert Dunlap were on his brief.
MR. JUSTICE WHITE delivered the opinion of the court.
This record requires us to determine whether the court below rightly refused to enforce an order of the Interstate Commerce Commission, by which it was found that an alleged terminal charge, made by the defendants in error, for the delivery of live stock to the stock yards in Chicago, was unjust and unreasonable, *321 and hence violative of the act to regulate commerce. To avoid the confusion which must be engendered by considering a number of irrelevant issues and to reach the single question to which the controversy is reducible, it is essential to state the facts, which are uncontroverted, concerning the making of the charge in question, and to bear in mind the results of a controversy relating to such exaction, which arose when it was first imposed by the railroad companies.
Prior to 1865 there were four different places in the city of Chicago at which live stock shipped to that city was delivered and marketed. The railroads by which such live stock was brought into Chicago were accustomed to deliver at any one of these four points as directed by the shipper, and no distinct terminal charge was made, the charge, if any, for the terminal services being embraced in the through rate exacted for carriage from the point of shipment to the place of delivery. In 1865 a corporation was formed, called the Union Stock Yards and Transit Company, which will be hereafter referred to as the Stock Yards Company. Under its charter this corporation was given the right to construct the necessary buildings and conveniences for the receipt, keeping and marketing of live stock. The corporation was given power to construct tracks connecting its facilities with the different lines of railway entering Chicago, and it was provided that when such tracks were constructed the Stock Yards Company might engage in the business of transporting stock and other freight over these tracks on its own account, or it might lease the privilege to do so upon such terms as might be deemed best. The facilities and the tracks were constructed, and it consequently came to pass that the general market for live stock in Chicago was transferred from the places at which such business had been previously carried on to the establishment of the Stock Yards Company. Leaving aside all question of charges on freight, other than live stock, from the incipiency of the opening of the stock yards in 1865 down to June, 1894, the railroads bringing in live stock to Chicago were accustomed to use the tracks of the Stock Yards Company for the purpose of delivering carloads of cattle, and for the use of these tracks by the various companies, for the *322 purpose above stated, no charge for trackage or otherwise was made against the railroads by the Stock Yards Company, except a small sum for the unloading of the cattle. During these thirty years the railroads did not divide their rates by separately charging for carriage from the point of shipment to Chicago and for terminal services rendered at Chicago, but asked one rate from the place of shipment to delivery at the stock yards.
In June, 1894, the Stock Yards Company imposed a trackage charge for carrying in carloads of cattle to the stock yards and in bringing the empty cars out. The railroads, therefore, became subject to an additional burden, the amount of which depended upon the distance which each road was obliged to carry its carloads of stock in going in and coming out over the tracks belonging to the Stock Yards Company. The situation of the various roads was such that no one of them in consequence of this new exaction paid less than 80 cents per car, that is, 40 cents each way, and none paid more than $1.50, that is, 75 cents each way. The railroad officials thereupon entered into an agreement that each road would impose a terminal charge of $2 upon each car of cattle taken into the stock yards. A joint circular was issued on behalf of the railroads, informing shippers on the subject, the circular being as follows:
"On and after June the 1st, 1894, a terminal charge of $2 per car will be made in addition to the Chicago rates as shown in the tariffs of the Western Freight Association on live stock and other freight received from or delivered to the stock yards or industries located on the tracks of the Union Stock Yards Railway, the Indiana Line Railway and the Northern Indiana Railroad."
The provisions of this circular were besides separately reiterated by the various railroads concerned in the agreement, and in their posted tariffs, as in those filed with the Interstate Commerce Commission, a memorandum was made showing the additional charge substantially in the form above stated. In other words, because the Stock Yards Company imposed on the railroads a charge for the use of its tracks, varying between a minimum of 80 cents per car of cattle to a maximum of $1.50 per *323 car, the railroads immediately exacted a terminal charge on each car of $2.
One of the roads which imposed this terminal charge was the Atchison, Topeka and Santa Fe. It was in the hands of a receiver appointed by the Circuit Court of the United States for the Northern District of Illinois. Keenan, a shipper, who carried on his business at the stock yards, refused to pay the added charge, and the receiver consequently declined to deliver to him a consignment of cattle. Keenan thereupon petitioned the court to instruct its receiver to make delivery of the cattle without the payment of the charge in question. Several persons interested in the receipt of cattle at the stock yards intervened, and prayed the court to make an order forbidding the receiver from exacting the additional $2. The Circuit Court granted the relief prayed for. It held that it had been settled in Covington Stock Yards Co. v. Keith, 139 U.S. 128, that a carrier could not lawfully divide his charge so as to separate the sum to be paid for terminal services from that exacted for the through carriage, unless the terminal services embraced some character of service not by operation of law included in the contract of carriage. 64 Fed. Rep. 992.
The case was taken to the Circuit Court of Appeals, where the decree of the Circuit Court was reversed. That court thought that the Circuit Court had misapplied the case of Covington Stock Yards Co. v. Keith, and, interpreting that case, held that it was not authority for the proposition that a carrier in a case like the one before the court could not divide its rate so as to separate the terminal charge from that for carriage from the point of shipment to the place of delivery. 73 Fed. Rep. 753, 760. The court held that it was disclosed by the record that Keenan was engaged in business at the stock yards, that the cattle shipped to him were intended for delivery there, and hence the contract contemplated such delivery beyond the rails of the final carrier; that it was therefore immaterial whether such carrier had facilities of its own for delivering cattle at any other place than the stock yards, because even if such other facilities had existed they would not have been used under the contract, since it contemplated that the *324 cattle were to be delivered at the stock yards and at no other place.
The court concluded its opinion as follows:
"It is not suggested, assuming any such charge as is here in question to be legal at all, that the amount is unreasonable. The contention that the carriers must move cattle from their lines of road over the track of the Stock Yards Company to the stock yards, without compensation other than as contained in their charges for hauling to points on their respective lines in Chicago (and this is what the claim of these appellees amounts to), is invalid."
Some months after the decision of the Circuit Court of Appeals the Cattle Raisers' Association of Texas, an organization composed of owners and raisers of cattle in Kansas, Montana, North and South Dakota, Texas and the Indian Territory, filed a petition before the Interstate Commerce Commission against the Fort Worth and Denver City Railway Company and its receiver, and various other railroad companies, and against the Stock Yards Company. The petition in substance complained that the terminal charge of $2 per each car of stock carried to the stock yards was unjust and unreasonable, was a discrimination against Chicago and in favor of other points to which cattle were shipped from the same territory, because at such other points no such terminal charge was exacted. In view of the method of charging adopted by the Stock Yards Company as to dead freight passing over its lines from the lines of many railroads entering Chicago the terminal charge above referred to was, moreover, alleged to be a discrimination against live stock as a species of traffic and in favor of dead freight. Subsequently the Chicago Live Stock Exchange, an association of commission men and raisers and owners of cattle, intervened, and attacked the terminal rate on substantially the grounds set out in the petition just referred to. The defendant railways answered. It suffices to say that the answers asserted that the terminal rate complained of was just and reasonable, and the discrimination alleged was denied. It was averred that for years previous to the imposing of the terminal rate complained of the carriers, under their contracts to carry and deliver cattle *325 in Chicago, had delivered such cattle to the stock yards without making any charge therefor, as in effect the rate asked for the carriage and delivery to Chicago of cattle did not include any terminal charge whatever, and such service was hence rendered gratuitously; that owing to the imposition in 1894 by the Stock Yards Company of the charge for trackage the carriers had exacted the $2 per car, which was only a just and reasonable equivalent for the cost incurred and service rendered in delivering the cattle to the stock yards. It was further alleged that at the time the terminal charge was imposed the rate to Chicago for cattle from the various points referred to in the complaint was unreasonably low and the addition of the terminal charge complained of was, in any event, but a just and reasonable addition to the through rate. It was, besides, alleged that such increase had not only been notified to the public by the circular issued in the name of the various railroads previously referred to, but had also been included in the rate sheets of the various railroads filed with the Interstate Commerce Commission in accordance with law. The Atchison, Topeka and Santa Fe Railroad, moreover, pleaded the decree rendered in the Keenan case, and averred in effect that such decree conclusively established the right to make the terminal charge in question. The various defendants, moreover, moved to dismiss the Chicago Live Stock Exchange from the proceedings for reasons not necessary to be stated.
After hearing the Commission filed its report. The motion to dismiss the intervention of the Chicago Live Stock Exchange was denied. The Stock Yards Company was dismissed from the cause on the ground that it was not a common carrier subject to the act to regulate commerce. The facts as found by the Commission concerning the terminal charge have been in substance given in the previous statement, and omitting for the moment reference to a finding of the Commission as to a reduction made by the carriers in the through rate after the terminal charge in controversy had been imposed, the conclusions reached by the Commission are embodied in the following summary:
First. Although the decree of the Circuit Court of Appeals in the Keenan case was held not to constitute res adjudicata *326 because of a want of identity of the parties concerned in the Keenan case and those involved in the case before it, the Commission, nevertheless, declared that it was its duty to follow and apply to the case before it the legal principles announced in the Keenan case. The Commission, therefore, announced that it recognized that each and all of the defendant carriers were entitled to divide their rates by making one separate and distinct charge for the carriage from the point of shipment to Chicago, and another separate and distinct charge for terminal services in Chicago beyond their own lines. This principle, however, the Commission found not to be decisive of the case before it, since, even although the right to divide the rate was fully recognized, the question remained whether the defendant carriers had in fact divided their rates and whether the charge complained of was just and reasonable.
Second. Coming to consider the two questions just stated, the Commission held that the action of the carriers in giving notice to the public of the imposition of the $2 terminal charge and the filing of the rate sheets with the Commission as required by law, did not constitute a division of the rates so as to separate the charge for carriage to Chicago from the charge for terminal services at that point, but amounted simply to a retention of the aggregated through rate existing before the $2 terminal charge was asked, and the adding of this $2 charge to the previous rate. It was found as a matter of fact that there was no evidence tending to show that the previous through rate was either unreasonably high or unreasonably low, and therefore the presumption was that the through rate prevailing prior to the imposition of the $2 charge was just and reasonable.
Third. Considering the cost of delivery to the stock yards over the rails of the Stock Yards Company, including the sum paid for trackage and all other expenses, the Commission found as a matter of fact that $2 per car would be just and reasonable. A reference to this subject, found in the report of the Commission, is excerpted in the margin.[1] To remove all possible *327 doubt as to the fact the Commission, in its opinion, on a rehearing, to which opinion we shall hereafter advert, said:
"The defendants were proceeding to show by testimony in each case that the actual cost to them of transporting these carloads of live stock, including the trackage charge and the cost of unloading, was equal to or in excess of $2. Thereupon it was suggested by the Commission, admitted by the intervenor, and at first partly admitted by the complainant, that the cost of service, including the trackage charge and the cost of unloading, was sufficient to justify the imposition of this terminal charge, provided, under the circumstances of the case, it could properly be imposed. We understand that the defendants are given the full benefit of this in the report and opinion already filed. To remove all doubt upon that subject, however, if it is not clearly found, we now find that, looking entirely to the cost of service, and including as a part of that cost the trackage charge paid the Union Stock Yards and Transit Company and the unloading charge paid that same company, the amount of this terminal, if, under the circumstances of this case, it is proper to impose the charge is reasonable. *328 If any modification of the present findings is necessary, they are hereby modified to that extent."
The fact, however, that the terminal charge of $2 was intrinsically just and reasonable, was held by the Commission not to show that such charge was just and reasonable "under the circumstances of the case," for the following reasons: As for many years the carriers had delivered to the stock yards for the through rate prevailing from the point of shipment to the point of delivery, they could not be assumed to have gratuitously performed the service of delivery. It was, therefore, held that pay for such service must be presumed to have been embraced in the through rate. The through and reasonable rate previously existing having been thus found to have embraced the cost of the terminal service, the Commission decided that it was unjust and unreasonable to add to the charge for terminal services, thus previously exacted, the arbitrary sum of $2 per car, because the Stock Yards Company had imposed for the first time, in 1894, an average charge of $1 per car. In other words, the $2 terminal charge, although it was intrinsically reasonable when considered alone, became unreasonable because it was an addition to the terminal charge necessarily embraced in the pay for terminal services which had been included in the through rate existing for so many years.
The opinion of the Commission leaves no room for doubt that such were its views on the subject. Thus stating the question which required to be decided, it was said: "Whether they (the carriers) ought to make the charge they do, or any charge, or whether the charge for delivery is already fairly included in the rate, is a proposition of fact for consideration." Again, referring to the matter, the Commission said: "We do not believe that these carriers should be allowed to add an arbitrary charge to the Chicago rate, for doing a thing which they for thirty years have said was included in that rate, and which we believe, considering the manner in which rates are made up and in which this rate has been made up, ought to be included in the rate;" and the following excerpts make the same thought more clearly manifest: "We think and find that the Chicago rate on May 31, 1894, included, as it had included for the last *329 thirty years, a delivery and unloading of the stock at the Union Stock Yards, and that rate, upon the record in this case, was a just and reasonable one." Further, in calling attention to the fact that the $2 terminal charge for the service of delivery at the stock yards would be just and reasonable, "if that service were performed by some independent agency," the Commission pointed out that the charge was not just and reasonable when made by the defendants, "because they were already receiving compensation for this service, they ought not to charge for it the second time." Further, it was said: "It is unreasonable to impose this terminal charge for the reason that the rate to Chicago already includes that charge;" and the conclusion is pointedly summed up by the observation: "Surely the fact that the railroad company is already receiving pay for this service is good ground for holding that a second charge is unreasonable."
The finding of the Commission was that the $2 additional terminal charge was unjust and unreasonable, in so far as that charge exceeded the sum which the carriers were actually obliged to pay in consequence of the trackage charge imposed by the Stock Yards Company. In other words, the Commission held that the average sum which the defendants were obliged to pay for the trackage charge was $1, and that this sum might be added without causing the existing rate to become unreasonable.
A reargument of the case was permitted. The Commission adhered to its original conclusions, and in addition held that as the terminal charge violated the statute, because it was unreasonable, it therefore operated a discrimination against Chicago, and hence was repugnant to the act to regulate commerce in this additional respect. The reasons by which the Commission was controlled were reiterated in an opinion which so clearly expresses the views entertained by it, which we have previously summarized, that an extract from the report of the Commission on the rehearing is excerpted in the margin.[1a]
*330 An order was issued by the Commission to carry out its conclusions. In substance the order commanded the defendants *331 whose lines of railway entered the city of Chicago to desist, on and before a named date, from charging, demanding, collecting *332 or receiving, in addition to their regular published transportation charges, the sun of $2 per carload of live stock, as compensation for terminal services rendered in making delivery thereof at the yards of the Union Stock Yards and Transit Company in the city of Chicago. Embodied in the order was the following recommendation:
"That said defendants be, and they severally are, hereby recommended not to charge, demand, collect or receive in excess of $1 per carload as compensation for terminal or switching services rendered in the delivery of live stock at the yards of the Union Stock Yards and Transit Company in said city of Chicago, which said sum of $1 per carload as compensation for such terminal or switching services is found and declared in and by said report and opinion to be just, reasonable and lawful."
In its opinion on the rehearing the Commission pointed out the reasons which caused it to recommend that each railroad exact only $1 for the additional terminal charge instead of the actual sum which the railroads were obliged to disburse for the trackage charge. The passage from the opinion referring to this subject is excerpted in the margin.[1b]
It is to be observed that the Commission in the course of its opinion expressly recognized the right of the defendant carriers *333 to increase their rates if they were unreasonably low. It is also to be borne in mind that by necessary implication arising from the opinion of the Commission it is also clear that that body likewise recognized the right of the defendant carriers under the circumstances of the particular case to segregate their rates by separating the charge made for carriage from the point of shipment to Chicago from the terminal services at that point.
The defendants, refusing to comply with the order of the Commission, that body filed a petition in the Circuit Court of the United States for the Northern District of Illinois to compel compliance. The defendants annexed and made part of their answers the responses which they had filed in the proceedings before the Commission. All the answers in effect averred the reasonableness of the charge of $2, denied the discrimination and expressly alleged that the charge in question constituted a separate terminal charge, embracing compensation for all the terminal services, and alleged that the effect of the filing of the rate sheets with the Interstate Commerce Commission and the notice given to the public concerning the charge of $2 had been to segregate the rates so as to distinguish the entire terminal charge from the through rate. It was, moreover, expressly averred that at the time the terminal charge was imposed the rates to Chicago on cattle from the points covered by the proceedings before the Interstate Commerce Commission were unreasonably low, and, in view of the outlay *334 occasioned at Chicago in the rendering of the terminal services, the terminal charge of $2 was in any event a just and reasonable increase of the then existing unreasonably low rate.
Before the Circuit Court the Commission contented itself with introducing in evidence certified copies of the proceedings had before it, other than the evidence taken by the Commission, and with offering such evidence as competent proof in the case. Although, on objection, the court excluded the evidence in question, it was subsequently stipulated that the transcript thereof need not be incorporated in the certificate of evidence signed by the district judge, and that, notwithstanding the objections interposed, the transcript might be produced to and inspected by the Circuit Court of Appeals for any proper purpose in case such inspection was deemed allowable. The evidence introduced on behalf of the railroad companies consisted only of the circulars and tariff sheets which had been issued and filed with the Commission, promulgating the charge in question. After hearing, the Circuit Court found that such charge was just and reasonable, and entered a decree dismissing the petition. 98 Fed. Rep. 173. On appeal, the Circuit Court of Appeals for the Seventh Circuit affirmed the decree of the Circuit Court. 103 Fed. Rep. 249.
The court held, as to the right of the carrier to make a terminal charge, under the circumstances disclosed by the record, that the case was controlled by the ruling of the Circuit Court of Appeals in the case to which we have previously referred, Walker v. Keenan, 73 Fed. Rep. 755, and the reasoning in that case was expressly approved. Coming to consider the question of the reasonableness of the terminal charge, the court held as that rate, abstractedly considered, was just and reasonable, it was in the concrete also just and reasonable, because the through rate which had prevailed for thirty years, and under which the carriers had delivered to the stock yards, embraced no charge for terminal services, such service having been performed during all the years in question gratuitously. Besides, the court considered that the filing of the schedules in 1894 with a memorandum as to the terminal charge of $2 had operated the segregation of the two rates. The views of the court *335 on this subject were thus stated in its opinion, 103 Fed. Rep. 249, p. 251:
"Prior to June 1, 1894, the railway companies seem to have assumed this burden themselves, but at this time a trackage was imposed by the stock yards of from 40 to 75 cents each way upon every car going and returning from the tracks of the railway company to the stock yards. It is insisted that, as this is the only extra expense the occasioned, any charge beyond that was unreasonable and improper. I do not think that necessarily follows. While the imposition of this trackage charge by the Union Stock Yards was doubtless the immediate occasion for a reformation of its tariff, the railway companies were then at liberty to adopt a new schedule with relation to these terminal facilities and charge what they actually cost them."
We are thus brought to consider the issue involved, that is, the reasonableness of the rate.
As the right of the defendant carriers to divide their rates and thus to make a distinct charge from the point of shipment to Chicago and a separate terminal charge for delivery to the stock yards, a point beyond the lines of the respective carriers, was conceded by the Commission and was upheld by the Circuit Court of Appeals, no contention on this subject arises. If, despite this concurrence of opinion, controversy was presented on the subject, we see no reason to doubt, under the facts of this case, the correctness of the rule as to the right to divide the rate, admitted by the Commission and announced by the court below. This is especially the case in view of the sixth section of the act to regulate commerce, wherein it is provided that the schedules of rates to be filed by carriers shall "state separately the terminal charges and any rules or regulations which could in anywise change, affect or determine any part of the aggregate of said aforesaid rates and fares and charges." Whether the rule which we approve as applied to the facts in this case would be applicable to terminal services by a carrier on his own line which he was obliged to perform as a necessary incident of his contract to carry, and the performance of which was demanded of him by the shipper, is a question which does not arise on this record, and as to which we are, therefore, called upon to express no opinion.
*336 We come, then, to consider whether there was a separation of the charge for carriage and the charge for the terminal services, and whether the rate  separated or aggregated, as may be found to be the case  was just and reasonable. To determine these questions, it is essential to fix the situation prior to June, 1894, at which time the increased terminal charge was first imposed. Undoubtedly prior to that date the published rate sheets of the defendants embraced only a rate from the point of shipment to Chicago, the place of delivery. There is room, even, for no pretence that there was in such schedules a setting apart of the terminal charge from the through rate. There is also no room for question that during the many years these rate sheets were in force the carriers, under their contracts to carry to Chicago, delivered carloads of cattle to the stock yards without making any charge other than that which was specified in the through rate. Under these circumstances, in the absence of proof, can it be assumed that the carriers were, for the many years in question, gratuitously performing the terminal services? That such assumption may not be indulged in results from the ruling in Covington Stock Yards v. Keith, 139 U.S. 128, where it was decided that, as for a through to a given point, the carrier contracted to delivered at that point, the presumption was that the through rate included adequate compensation for the services rendered at the point of delivery. Applying this principle, it results that the through rate existing prior to June the 1st, 1894, certainly in the absence of proof to the contrary, must be presumed to have provided in and of itself compensation for the services rendered in making delivery at the stock yards. Did the carriers, in June, 1894, when they imposed the alleged terminal charge of $2, separate in their schedules this charge from the through rate. That is, did they divide their charges by setting apart the terminal charge embraced in their previous through rate so as to segregate it from the through rate, thus making one distinct terminal charge and another distinct through rate? The mere inspection of the schedules demonstrates that such division was not made. This is the convincing result, since the schedules did not purport to draw out from the previous through rate the sum of compensation contained therein for *337 terminal services. On the contrary, the entire previous through rate was retained, and a memorandum was placed upon the schedules to the effect that thereafter an additional charge of $2 for delivery at the stock yards would be exacted. This was a mere addition to the sum of the terminal charge embraced in the prior through rate. We think that it cannot be said that to add an additional amount to a former charge was necessarily to divide such former charge, without holding that do add one sum to another is necessarily to divide the other. The act to regulate commerce exacts that the schedules to be printed and filed by carriers must plainly state "the places upon the railroad between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately the terminal charges and any rules or regulations which in any wise change, affect or determine any part or the aggregate of such aforesaid rates and fares and charges." The purpose of this provision was to compel the schedules to be so drawn as to plainly inform of their import, was to exact that when the rates were changed the change should be so stated as not to mislead and confuse, all of which would be frustrated if the schedules relied upon were given the effect which the defendants now claim for them. And the reasons just given dispose of the contention that because it was found that the terminal charge of $2, abstractly considered, would be just and reasonable, therefore it should have been held to have been just and reasonable as applied to the case in hand. This obscures the fact that compensation for the terminal service was presumptively included in the through rate existing for so many years, and therefore, the $2 did not constitute the terminal rate, but that such rate after the $2 was imposed consisted of that sum plus the amount of compensation for the terminal service which had always been contained in, and which continued to be embraced in, the through rate.
Under the foregoing conditions, was the imposition by the railroads of the additional charge of $2 just and reasonable, measured by the criterion which the Commission adopted, that is, "under the circumstances of the case?" It needs no reasoning to demonstrate that the Commission correctly held that the *338 mere imposition by the Stock Yards Company of a new burden, averaging $1 per car, did not justify an additional charge by the carriers of $2 per car. It is likewise equally plain that if the prior rate was just and reasonable, as the Commission found it to be, that the addition, without reason, of $2 per car, caused the rate to become unjust and unreasonable to the extent of the $1 extra.
It follows that the order of the Commission was right if its correctness depends upon the considerations previously stated. But such is not the case. In the report on the original hearing the Commission said:
"If the through rate were what was really aimed at by the complaint, then all ground of complaint has been removed since the complaint itself was filed. About October the 1st, 1896, rates on live stock from points embraced in the territory covered by this complaint to all western markets, including Chicago, were reduced five cents per one hundred pounds. This would amount to from ten to fifteen dollars per car. Therefore the Texas shipper would actually deliver his stock in Chicago for from eight to thirteen dollars per carload cheaper than he could before the $2 rate was imposed, and all the complaint asks for is the abolishment of that terminal charge. This charge is imposed by the terminal carriers at Chicago, and those carriers receive and retain the amount of that charge. The complaint is that this charge is an unlawful one; that no matter what the Chicago rate may be the addition of this particular sum to that rate is in violation of the act to regulate commerce."
In other words, it was held that the rate, which was unjust and unreasonable solely because of the $1 excess, continued to be unjust and unreasonable after this rate had been reduced by from ten to fifteen dollars. This was based, not upon a finding of fact  as of course it could not have been so based  but rested alone on the ruling by the Commission that it could not consider the reduction in the through rate, but must confine its attention to the $2 terminal rate, since that alone was the subject-matter of the complaint. But, as we have previously shown, the Commission, in considering the terminal rate, had expressly found that it was less than the cost of service, and was therefore *339 intrinsically just and reasonable, and could only be treated as unjust and unreasonable by considering "the circumstances of the case; "that is, the through rate and the fact that a terminal charge was included in it, which, when added to the two dollar charge, caused the terminal charge as a whole to be unreasonable. Having therefore decided that the $2 terminal charge could only be held to be unjust and unreasonable by combining it with the charge embraced in the through rate, necessarily the through rate was entitled to be taken into consideration if the previous conclusions of the Commission were well founded. It cannot be in reason said that the inherent reasonableness of the terminal rate, separately considered, is irrelevant because its reasonableness is to be determined by considering the through rate and the terminal charge contained in it, and yet when the reasonableness of the rate is demonstrated, by considering the through rate as reduced, it be then held that the through rate should not be considered. In other words, two absolutely conflicting propositions cannot at the same time be adopted. As the finding was that both the terminal charge of $2 and the through rate as reduced when separately considered were just and reasonable, and as the further finding was that as a consequence of the reduction of from ten to fifteen dollars per car, the rates, considered together, were just and reasonable, it follows that there can be no possible view of the case by which the conclusion that the rates were unjust and unreasonable can be sustained.
These views dispose of the case, but before concluding we advert to a statement made by the Commission in its opinion delivered on the reargument. The expression referred to is as follows:
"It is also said that since the imposition of this terminal charge the Chicago rate has been reduced so that the total amount to-day, including the terminal charge, is much less than it was in 1894, when the charge was imposed. The case finds that such a reduction was made about October 1, 1896. The reduction did not, however, apply to all the territory to which the terminal charge applies, but only to certain limited portions of that territory, and the purpose of it was to equalize the rate *340 from those sections as compared with other sections. There is no claim that this reduction was made on account of the imposition of the terminal charge, or that it would not have been made had no terminal charge been imposed, nor that if the Chicago rate, June 1, 1894, ought to have carried with it a delivery at the stock yards the present rate should not likewise do so."
It is apparent that there is an irreconcilable conflict between the statement thus made and the facts as recited by the Commission in its first report, for therein it was declared that the reduction applied "to live stock from points embraced in the territory covered by this complaint to all western markets including Chicago. . . ." The report deduced from this premise of fact the conclusion that if the through rate could be considered "all ground of complaint has been removed" by the reduction. We find it in reason difficult to treat the statements made after the reargument as substantive findings of fact, overthrowing the facts stated in the first report, for this reason: In the passage which we have already excerpted from the report of the Commission announced after the reargument, it will be seen that it is declared that the previous findings are modified to the extent necessary to make it clearly appear that the terminal rate of $2 independently considered had been found unquestionably to be reasonable, and there is no expression in the report on the reargument tending to show that it was the purpose to modify in other particulars the findings as previously made. The case, therefore, reduces itself to this: The finding in the first report is that the reduction applied to the whole territory and removed all ground of complaint if the through rate could be considered, whilst the statement in the report after the reargument is that the reduction in the through rate did not apply to the whole territory, but was only partial. Aside from this difficulty another confronts us. The first finding of the Commission was that both the through rate and the terminal rate, separately considered as distinct charges, were in and of themselves just and reasonable at the time the complaint was filed, and this is expressly reiterated in the report delivered after the reargument. Now the passage which we *341 have just previously excerpted from the report after the reargument states that the reduction of the through rate was partial, and applied only to portions of the territory, and that it was made in order to "equalize the rates from those sections as compared with other sections." But it is impossible in reason to accept this conclusion, even if it be treated as a finding of fact, if the finding made originally and reiterated after the reargument is to be applied, that is, that the rates when separately considered were just and reasonable. This is necessarily the case, since in consonance with reason it cannot at the same time be declared that the rates separately considered were just and reasonable at the time the complaint was filed, and yet it be found that some of the just and reasonable rates were unequal, and hence unjust, and required to be changed in order to remove the inequality, and therefore the unreasonableness which existed in them. If, however, the conflicts to which we have referred be put out of view and the statement in the report after the reargument, to which we have adverted, be treated as a substantive finding and as overthrowing by implication the findings expressly made in the first report and some of those expressly reiterated in the second report, we find ourselves nevertheless unable to reverse the court below and direct the execution of the order entered by the Commission. That order was general and operated upon all the carriers in the whole territory covered by the complaint. But if the statement on the rehearing which we are considering be taken as a finding and given, arguendo, the force previously stated, then it follows that the rate from the points in the territory to which the reduction applied were just and reasonable, and as to those points the order should not have been rendered, and there is no finding establishing the points to which the reduction applied which would enable us to separate the reasonable from the unreasonable rates. It results that the findings do not afford the basis of even sustaining the order in part. Whether or not, in making the reduction, the terminal charge entered into the minds of the carriers is a matter of no concern. The question is, was the rate as reduced just and reasonable?
Being then constrained to the conclusion that the order of *342 the Commission was not sustained by the facts upon which it was predicated, we cannot enter into an independent investigation of the facts, even if it be conceded the record is in a condition to enable us to do so, in order that new and substantive findings of fact may be evolved, upon which the order of the Commission may be sustained. Louisville &c. R.R. Co. v. Behlmer, 175 U.S. 648-675.
It follows that the decree of the Circuit Court of Appeals, which affirmed the decree of the Circuit Court, refusing to command compliance with the order of the Commission, was right, and it must, therefore, be affirmed. We think, however, in view of what has been said, and in order to prevent all possible misconception, that it should be stated that nothing in the decree refusing to execute the order of the Commission should be construed as preventing that body, if it deems it best to do so, from hereafter commencing proceedings to correct any unreasonableness in the rate resulting from the additional terminal charge as to any territory to which the reduction referred to in the opinion, if any such there be, did not apply.
The decree of the Court of Appeals is therefore affirmed without prejudice to the right of the Commission to hereafter proceed in accordance with the reservation expressed in the opinion just announced.
MR. JUSTICE BROWN took no part in the decision of this cause.
NOTES
[1] The intervenor conceded upon the trial, and the complainants did not seriously question, that the amount of this charge was reasonable, if under the circumstances, the charge should be imposed. Before the close of the testimony the several defendants were requested by the Commission to furnish statements showing the actual or estimated expense to them in each case of making delivery from their several tracks to the Union Stock Yards.

Such statements have been filed, and they make the following showing:

Illinois Central Railroad, via 75-cent trackage route ............ $2 23
Via 40-cent trackage route ....................................... 1 65
 Average ....................................................... $1 94
Chicago, Burlington and Quincy Railroad .......................... 2 25
Chicago and Alton Railroad ....................................... 2 05
Chicago, Milwaukee and St. Paul Railway, via one route ........... 2 67
Via other route .................................................. 2 25
 Average .................................................... 2 46
Atchison, Topeka and Santa Fe Railway ............................ 2 28
Chicago Great Western Railway (average of 10 cars to train) ...... 2 20
Chicago and North-Western Railway ................................ 3 34
Wabash Railroad .................................................. 1 86
Chicago, Rock Island and Pacific Railway ......................... 1 65
 ______
 Total via nine lines ................................... $20 03
 Average ................................................ 2 22

[1a] "The Commission, itself did, however, state upon the hearing at various times, in terms upon which the defendants were justified in relying, that no question could be successfully made as to the reasonableness of this charge (the terminal charge in question) in certain aspects. Just exactly the scope of that intimation can be understood by referring to the circumstances under which it was given. The defendants were proceeding to show by testimony in each case that the actual cost to them of transporting these carloads of live stock, including the trackage charge and the cost of unloading, was equal to or in excess of $2. Thereupon it was suggested by the Commission, admitted by the intervenor, and at first partly admitted by the complainant, that the cost of service, including the trackage charge and the cost of unloading, was sufficient to justify the imposition of this terminal charge, provided, under the circumstances of this case, it could be properly imposed. We understand that the defendants are given the full benefits of this in the report and opinion already filed. To remove all doubt upon that subject, however, if it is not clearly found we now find that, looking entirely to the cost of service and including as a part of that cost the trackage charge paid the Union Stock Yards and Transit Company and the unloading charge paid that same company, the amount of this terminal, if, under the circumstances of this case, it is proper to impose the charge, is reasonable. If any modification of the present findings is necessary they are hereby modified to that extent. That finding must, however, be carefully read in connection with the other facts in the case, and the conclusion of the Commission that the imposition of this terminal charge is reasonable. The defendants say it was admitted that this charge was reasonable, `provided any charge could be legally made for the terminal service.' The intimation of the Commission was as indicated in the above extract from the record, that if this charge was proper to be imposed, it was a reasonable charge.' The reason for the conclusion of the Commission is to be found in the distinction between these two statements. What the Commission passed upon finally was, not whether a terminal charge of this sort could be legally made  that had been already determined by the courts  but whether this particular charge could be properly imposed under the circumstances of this case. To avoid misapprehension, we will restate here the grounds for our decision, and for that purpose we confine attention to this rate as it existed on May the 31st and June the 1st, 1894. On May the 31st there was in effect a certain rate on live stock from various points to Chicago, and that rate, upon the record in this case, must be taken to be a just and reasonable one. The defendants intimate in their answer that this rate has been forced down until it was too low, and something was said in the proof looking in the same direction. Upon the other hand, the complainants started in to prove that the rate at that time was too high, but as is found by the case both these claims were virtually abandoned. There is nothing in the record before us to show that the rate was other than a right one, and we assume that on May the 31st the rate in effect was just and reasonable. Now, just what did this live stock rate to Chicago include? The defendants insisted on the reargument of this case that it covered the transportation of that live stock to the point where, on its way to the Union Stock Yards, it left the tracks of these several defendants, and nothing more. The complainant insisted that that rate covered a delivery of the stock at the stock yards. We are unable to see any ground whatever for the contention of the defendants. As a matter of law, the undertaking to transport live stock from one place to another includes a delivery of the stock. Originally live stock brought to Chicago by these defendants must be delivered at any one of four different points. This was necessitated by the actual competitive conditions at that market. The railway companies for the purpose of avoiding the expense and inconvenience of this kind of delivery created the present stock yards.

* * * * * * * *
"It was entirely at their suggestion and entirely for their benefit at the outset. From the time the stock yards were constructed down to June 1, 1894, the various defendants had, by arrangement with the Stock Yards Company, the right to use the tracks of that company for the delivery of this stock at the Union Stock Yards. By the action of the various carriers that became the only place in Chicago at which live stock could ordinarily be delivered. Whenever a carload of live stock was shipped to Chicago, in the absence of special directions, it was taken to the Union Stock Yards. This was understood both by the carrier and by the shipper. No defendant had any facilities previous to June 1 for delivering live stock in any quantity at any other point than at the Union Stock Yards. Now, in view of the legal liability resting upon the carrier to make a delivery somewhere, in view of the fact that this delivery must be made at the stock yards and was habitually made there, it seems impossible that the defendants, in making this rate from the point of shipment to Chicago, did not include in that rate and contemplate as a part of the service covered by that rate a delivery at the Union Stock Yards. It is absurd to say that the Chicago rate paid for the transportation of that stock up to some switch in the field, or in the city where there was no facility for a delivery, and that the transportation beyond that point was a gratuity. We think and find that the Chicago rate on May 31, 1894, included, as it had included for the last thirty years, a delivery and unloading of the stock at the Union Stock Yards, and that rate, upon the record in this case, was a just and reasonable one.
"June 1, 1894, these defendants, by concerted agreement among themselves, increased this rate to $2.00 per car. If the rate on May 31 was a just and reasonable one, the rate on June 1 was an unjust and unreasonable one, unless some new condition justified the imposition of that additional charge. We have found that to the extent of $1.00 a new condition did justify the additional charge, for the reason that then, for the first time, the Stock Yards Company exacted this trackage charge. In other words, the cost of service to the defendants was increased by just $1.00 on that day. It must follow, therefore, as a necessary conclusion, that of the increase which the defendants made, $1.00 was justifiable and $1.00 was unjustifiable. This is not, however, because $2.00 is an unreasonable charge for transporting a car to the stock yards, if that service was performed by some independent agency, but because, since the defendants were already receiving compensation for this service, they ought not to charge for it the second time. Of this proposition we have no doubt. Upon the assumption that the rate May 31 was a just one, we regard the imposition of anything above what the defendants were then compelled for the first time to pay as an unwarranted exaction and a violation of the first section of the act to regulate commerce, if it is possible to violate that section."
[1b] "The original opinion intimates that the only logical conclusion from the reasoning there stated would be to allow each carrier to retain whatever that particular carrier is obliged to pay the Union Stock Yards and Transit Company by way of this trackage charge. That would, however, result in compelling all companies to retain the smallest amount paid, since the terminal by all routes must be the same. We understood that in allowing $1 to be retained we were virtually giving to the carriers 20 cents upon each car, but in view of the fact that many of the defendants were compelled to pay $1.50 by way of trackage charge, this seemed, on the whole, reasonable. Upon the reargument the defendants were inquired of whether they desired a modification of this order so that each one be allowed to retain the amount actually paid, and without exception they stated that they did not ask such a modification. Attention is called to this fact at this time for the purpose of showing that what is apparently an inconsistency in the conclusion of the Commission is really in favor of the defendants, and that the defendants do not for that reason desire to have that inconsistency removed."