ADAMS et al. v. MELLON, Director General of Railroads.

No. 4462.

Circuit Court of Appeals, Seventh Circuit.

July 27, 1931.

Rehearing Denied Sept. 22, 1931.

Franklin J. Stransky, of Savanna, Ill., and Clair R. Hillyer and James P. Carey, Jr., both of Chicago, Ill., for appellants.

Sidney F. Andrews, of Washington, D. C., and A. A. McLaughlin, of Des Moines, Iowa, for appellee Mellon.

Frank H. Towner, Ralph M. Shaw, and Silas H. Strawn, all of Chicago, Ill., for appellee Union Stock Yard Co.

Before ALSCHULER and SPARKS, Circuit Judges, and LINDLEY, District Judge.

ALSCHULER, Circuit Judge.

The appeal is from a judgment of the District Court given in an action there brought to enforce an order for reparation awarded by the Interstate Commerce Commission against the Director General of Railroads and the Union Stock Yard & Transit Company in the sum of $140,001.25, with interest and attorneys' fees. The order for reparation was based on the collection of a charge of 25 cents per car for loading and unloading live stock at the Union Stock Yard in Chicago during the period of federal control of the railroads. At the close of all the evidence the court, upon motions of defendants, directed the jury to return a verdict for defendants.

The Stock Yard Company was organized in 1865 to construct and operate stockyards, and railway tracks connecting the yards with the several railroads entering Chicago. Its capital stock was then held by or in the interest of the line-haul railroads. In 1867 the Stock Yard Company established a charge of 50 cents for loading and 25 cents for unloading each car of live stock, which charge was assumed and paid by the several line-haul railroads. The railroads moved the cars with their own power over the tracks of the Stock Yard Company to its unloading platforms, and the stock was unloaded by the stockyard employees.

In 1894 the Stock Yard Company's tracks were transferred to the Chicago Junction Railway Company. A through tariff was then published by the railroads, which included a switching charge of $2 for each car moved between the termini of the railroads and the stockyard. Out of this charge grew a controversy as to whether the Stock Yard Company was a common carrier engaged in interstate commerce, and subject to the provisions of the act to regulate commerce. The Commission determined that it was such a common carrier. The controversy reached the Supreme Court on an appeal from the United States Commerce Court, and in 1912 the Supreme Court decided that the Stock Yard Company was a common carrier engaged in interstate commerce, and subject to the provisions of the act. United States v. Union Stock Yard & Transit Co., 226 U. S. 286, 33 S. Ct. 83, 57 L. Ed. 226.

The Stock Yard Company thereupon duly published its tariff, fixing the charge of 50 cents for loading and 25 cents for unloading each car, and the line-haul railways, in their published tariffs, absorbed these charges in the stated amount of 50 cents for loading and 25 cents for unloading each car, the absorbing words of the tariffs being:

"Carriers as Shown Will Pay the Union Stock Yards & Transit Co.'s Charges as Follows:

"In Cents Per Car—Loading Charges    50
                    Unloading Charges   25"

The Stock Yard Company filed with the Interstate Commerce Commission, effective May 21, 1917, a tariff increasing these loading and unloading charges by 25 cents per car, which increase the line-haul carriers declined to absorb. The railroads did not amend their tariffs, but the charge of 25 cents increase per car was indorsed on the freight bills, and paid by the yards commission merchants—to whom the shipments were consigned—and ultimately received by the Stock Yard Company. When the railroads passed into federal control (December 28, 1917), the Director General of Railroads likewise declined to absorb the 25 cents per car increase, and without publication of any further tariff the additional 25 cents per car continued to be collected and paid as before.

The Stock Yard Company, contending that by reason of certain changes in its relation with the Chicago Junction Railway Company it was no longer a common carrier of interstate commerce, filed with the Interstate Commerce Commission its tariff, effective September 1, 1917, canceling its previously filed loading and unloading tariff charge. The Commission suspended the effectiveness of the notice of cancellation from time to time until the expiration of government control, so that it never became effective. The suspension of the cancellation left in force the last previously published tariff, which had increased the loading and unloading charge by 25 cents per car.

November 17, 1917, the Chicago Live Stock Exchange, composed of commission merchants at the Chicago stockyard, filed complaint with the Interstate Commerce Commission against the Stock Yard Company and the line-haul carriers, against the 25 cents loading and unloading increase, and charged that its collection violated sections 1 and 3 of the Interstate Commerce Act (49 USCA §§ 1, 3). This complaint was consolidated with the controversy respecting cancellation of the 25 cents per car increase, and the matters were heard by the Commission.

Respecting the complaint of the Chicago Live Stock Exchange, its demand for cessation of the increased unloading charge and for reparation involved the question of whose duty it was to load and unload the live stock at the Chicago yard. The proposition was discussed in the Commission's report and opinion (52 I. C. C. 209, February 11, 1919), and the conclusion was announced that: "3. The loading and unloading of live stock, in carloads, at the Chicago stockyards is a duty of the shipper."

March 31, 1919, the Exchange filed a petition for rehearing, and the Commission reopened the case, then, for the first time, naming the Director General of Railroads as a respondent. There was further hearing, and on July 15, 1920, the Commission filed an opinion, wherein it is stated, inter alia: ·

"For the reasons stated we are of opinion that our finding that it is the duty of the shipper to load and unload live stock in the stockyards at Chicago was error, and it is therefore reversed. And we now find that it was the duty of the carriers to unload and load live stock at that point."

"We further find that shippers who paid and bore charges for unloading and loading live stock at the stockyards in addition to the rates to and from the stockyards and who are parties of record herein have been damaged in the amount of such charges and are entitled to reparation, with interest from the date of such payment. The exact amount of reparation due each shipper can not be determined on this record, and they should comply with rule V of the Rules of Practice." Chicago Live Stock Exchange v. A. T. & S. F. Ry. Co. et al., 58 I. C. C. 164.

Thereupon the Exchange, on behalf of its members, whom it named, petitioned to have ascertained and awarded the amount of reparation to which each of such members is entitled. Under date of June 2, 1925, the Commission filed its report of the further hearing thereon, in which it found that the various named individuals, corporations, and firms constituting such members are entitled to reparation for the increased loading and unloading charges paid, and directed preparation of statements of the particular amounts, separated as to the participating carriers. 100 I. C. C. 266. Subsequent statements were filed with the Commission specifying the payments as to the various carriers, and the various members of the Exchange, and reparation was ordered accordingly.

During the course of the proceedings there was also filed a statement of the various shippers, and of the shipments to the different members, and of the carriers over whose lines the different shipments moved.

The reparation order directed the payments to be made to the several commission merchants, whom the Commission found to be entitled thereto, and the suit in the District Court upon the award was brought by these various commission merchants, corporations, firms, and individuals—103 of them.

Appellees contend that, while appellants physically paid the bills, they did not ultimately "bear" them, but that they were borne by the shippers of the live stock, and that therefore the several commission merchants had no such interest in the claims for reparation as entitled them to maintain suit thereon.

The general course of practice was this: The consignors shipped to the commission merchants. Upon arrival of the cars at the stockyard, the stock was unloaded by stockyard employees and placed in the pens of the different commission merchants, who generally sold the consignment the same day, receiving the purchase price before night. Upon arrival of the car, the waybills, with the 25 cents unloading charge indorsed upon each, were delivered to the employees of the Stock Yard Company, who turned them over to a joint agent of the carriers and the Stock Yard Company. The agent checked the weights and delivered the corrected bills to the Stock Yard Company, which then advanced to the line-haul carriers, for the consignees, the full amount of the bills, including the 25 cents additional unloading charge, and the carriers later paid the Stock Yard Company its part of the charges.

The commission merchants promptly accounted to their shippers for the amount realized from sale of their live stock, deducting commissions, freight charges, and other proper outlays of the commission merchants; and twice weekly the Stock Yard Company collected from the commission merchants the amount of such advances to the carriers.

It would be seldom indeed that the commission merchants would advance their own money in payment of freight charges; but in case they did so they would be reimbursed promptly through realizing upon the shipment. To the extent that this may be an influential fact, it may be said that, in general, the commission merchants made no advances for the shippers, but paid the transportation charges out of the shippers' funds in their possession. But, regardless of the precise

order of the payments, it is clear that, at the time of the proceedings for reparation, the commission merchants had been long and fully reimbursed by the shippers for any such outlay, and it is not apparent how it can be said that the 25 cents charge was in fact "borne" by them, or by any one other than the shipper.

In the opinion of the District Court [Adams et al. v. Mellon, Director General, et al., 39 F.(2d) 80], there was considered only the question whether appellants had such interest, or sustained such injury through payment of the increased charge, as entitled them to maintain this action. The opinion exhaustively and interestingly treats the question, and many cases are cited.

It appears that up to and including the time when the Commission made the decisions herein, reported at 52 I. C. C. 209, and 58 I. C. C. 164, it had held in a long line of cases that a consignee who did not actually bear alleged unlawful charges was not entitled to reparation therefor, notwithstanding he had in the first instance made payment to the carrier. That question was not discussed in either of those opinions; indeed, in that of 58 I. C. C. 164, it was not undertaken to adjudge who in fact was entitled to the reparation, except to conclude that "shippers who paid and bore charges for unloading and loading live stock at the stockyards in addition to the rates to and from the stockyards and who are parties of record herein have been damaged in the amount of such charges and are entitled to reparation, * * *." But in the decision made June 2, 1925, reported in 100 I. C. C. 266, 270, it was found that the various commission merchants therein named (who are the same as appellants here) "made the shipments" and "paid the charges thereon," and have been damaged and are severally entitled to reparation in their own names to the amount of the charges "as factors and agents for the shippers."

In the meantime (April 7, 1924) the Commission had decided the case of Missouri Portland Cement Co. v. Director General, 88 I. C. C. 492, wherein it reached a conclusion different from its theretofore long line of decisions, deciding that a consignee who had in the first instance paid an excessive transportation charge, though reimbursed, was a proper party to institute and maintain reparation proceedings. It appears that four of the Commissioners participating in the reparation award of 100 I. C. C. 266, 273, did so "only as constrained thereto by the decision

of the majority in Missouri Portland Cement Co. v. Director General."

The action does not purport to be brought by appellants otherwise than in their respective individual capacities. Indeed, with attention directly challenged to their right to sue, it was contended by their counsel that they had such right, and, while most likely the shippers would have the benefit of any recovery, this was wholly within appellants' volition.

In the District Court opinion Judge Woodward discusses the Interstate Commerce Commission decisions, and many others, particularly Southern Pac. Co. v. Darnell-Taenzer, 245 U. S. 531, 38 S. Ct. 186, 62 L. Ed. 451, and Louisville & N. R. Co. v. Sloss-Sheffield, 269 U. S. 217, 46 S. Ct. 73, 70 L. Ed. 242, reaching the conclusion that appellants in their own right may not maintain the suit.

Our examination of this question does not so entirely satisfy us of the correctness of the District Court's conclusion thereon as to justify our deciding the appeal upon ground so formal and technical, if a proper result may be reached upon the merits of the cause.

In considering appellants' motion made after judgment had been entered, for reopening the case and permitting amendment to be made to the declaration to the end that the plaintiffs may maintain the action as trustees for the various shippers, evidently the ground upon which the court had directed the verdict was again questioned. The court then said: "While the court, in its opinion, did not advert to the other points argued by the defendants, yet it seems to the court that on other grounds, not referred to in the opinion, the judgment of the court may be maintained." In our view of the case, there are other grounds on which the judgment may be rested.

It would greatly transcend the reasonable scope of such an opinion to present discussion of all of the many propositions put forward by the parties in the 700 printed pages of briefs and arguments submitted to us. Our further comments will relate to the merits of the reparation claims, without regard to the right of appellants to maintain the action therefor.

For the contention that the Stock Yard Company could not lawfully impose on the shipper these increased charges, appellants place much reliance on Covington Stock-Yards Co. v. Keith, 139 U. S. 128, 11 S. Ct. 461, 35 L. Ed. 73. A decree was there affirmed finding that certain terminal charges

at the Covington stockyards were for services which the carrier was bound to perform, and that a consignee would not be obliged to make use of those yards for unloading live stock unless such additional charge was waived; and, in default of such waiver of charges, the consignee might himself maintain suitably located pens at which stock consigned to him should be delivered by the carrier if he (the consignee) would keep a representative there to receive the stock. That action was begun in 1886—before the passage of the Interstate Commerce law—and of course was uninfluenced by published tariffs of a participant in interstate commerce, as is the case with the Chicago yard. The situation was entirely different, and in our judgment the case has little, if any, application here.

■ Since the passage of the Interstate Commerce Law, the right to make separate terminal charges seems clear, but with the limitation that such charges, if themselves reasonable, must not, in connection with all the other transportation rates, produce an unreasonable aggregate. Interstate Commerce Commission v. C., B. & Q. R. R. Co., 186 U. S. 320, 22 S. Ct. 824, 46 L. Ed. 1182; Interstate Commerce Commission v. Stickney et al., 215 U. S. 98, 30 S. Ct. 66, 54 L. Ed. 112.

United States v. Union Stock Yard Co., supra, also relied on to same effect, far from sustaining appellants' contention of the impropriety of the additional charge, in our judgment does the very contrary by holding the yards company to be an interstate carrier, under the jurisdiction of the Commission, and required to file tariff rates for that part of the service which it performs, and to collect and receive its rates while its published tariff remains in effect.

The absorption by the line-haul carriers of the originally filed rate of 50 cents and 25 cents for loading and unloading cars was not a gratuity on the part of the carriers. The comprehensive operations of the Stock Yard Company greatly facilitated the handling of stock at Chicago for all the line-haul carriers. It undertook the service of rapidly unloading the cars coming into that great market. Its facilities made possible that elasticity of service which tended continuously to speed the unloading of live stock, regardless of variations in daily deliveries by the several carriers, and promptly to release the rolling stock for further movement.

Under the law, the entire transportation service must be rendered at a reasonable rate, and the absorption of this loading and un-

loading charge was in fact a promulgation by the line-haul carriers of such a rate for the entire service as was then deemed reasonable. The result to the shipper would have been the same had the line-haul carriers correspondingly reduced their rates, and not absorbed the loading and unloading charges.

In our judgment, this absorption extended only to the amounts specifically named in the absorption clause; and, when the Stock Yard Company promulgated its 25 cents increase, not only did the original absorption not include this increase, but the line-haul carriers definitely refused to absorb it; and, when the carriers passed into federal control, the refusal to absorb was persisted in. But this left it none the less the lawful duty of the Stock Yard Company to collect the increased charge of 25 cents upon each car, and failure to collect would have subjected that company to the penalties which the law prescribes.

The ineffectual attempt to cancel its published tariff left it in continuing force until, upon the close of federal administration, section 418 of the Transportation Act, 49 USCA § 15 (1–7), definitely, and for the first time, required thereafter the line-haul carriers to load and unload all live stock offered for shipment.

If, when the cars reached the yard, and either before or after unloading, the Stock Yard Company had demanded, and the consignees had paid, the 25 cents charge, we do not think it could be said that the line-haul carrier made the collection. But it seems to us that, notwithstanding the seeming circuity, it was the Stock Yard Company which in effect collected the charge from the shipper or consignee. Upon arrival of the cars, the Stock Yard Company, for and on behalf of the consignees, advanced the entire transportation charges, including the 25 cents, and turned the entire amount over to the line-haul carriers, which turned back to the Stock Yard Company the 25 cents, together with the other yard charges. Whatever the form of the transaction, it seems to us to have been, in essence, but a collecting of the 25 cents by the Stock Yard Company, which, under its published tariff, it was bound in any event to collect. No one was taken by surprise or deceived. The rate had been duly published, and shippers or their representatives, the commission merchants, knew of this charge, and that the Stock Yard Company would be obliged in some manner to collect it.

No contention is made that the charge itself was unreasonable, or that, taken in con-

nection with the other transportation charges, the entire rate was unreasonable. The extent of the Commission's second conclusion was that the collection of the increased 25 cents was "an unlawful and unreasonable practice." The finding that it was an unreasonable practice is not a finding that it was an unreasonable rate.

We judicially know, even if the record did not disclose it, that the cost of such service as was rendered at the stockyard had increased very materially by the beginning of government control of the railroads, and this was the only increase in that rate since it was first fixed, many years before the World War began, notwithstanding the very substantial increase in transportation rates generally.

It seems from the record that in these tariffs themselves there is a background of authoritative rules and regulations which tend strongly to fortify the conclusion reached in the Commission's first decision, and our views as well.

It is stipulated by the parties that "all shipments of livestock involved in this suit consisted of carloads moved on carload ratings as ordinary livestock." It appears in Official Classification No. 44, under head of "Rules and Special Instructions":

"Unless otherwise provided when property is transported subject to the provisions of the Official Classification, the acceptance and use are required, respectively, of the 'Uniform Bill of Lading,' 'Straight' or 'Order,' 'Export Bill of Lading,' 'Uniform Live Stock Contract' * * *"

In the Uniform Live Stock Contract it is provided that: "Sec. 5. The shipper at his own risk and expense shall load and unload said live stock, * * *" and that: "8. It should be understood in receiving Live Stock of any description for transportation, that the actual delivery does not commence until the stock has been placed in the car, and the responsibility of the Railroad Company shall cease upon the delivery of the car at the station to which it is consigned. The consignor and the consignee are responsible for the loading and unloading of the same, the carrier assuming no liability whatever in regard to such loading and unloading."

These provisions were in force throughout the period of federal control of railroads. Their existence is not disputed—only their application is denied by appellants.

There is significance in the fact that the government, in taking over the transportation facilities, did not take over the stockyard. It is quite likely that this branch of the transportation was deemed in its nature quite separable from the rest, and that this highly specialized service had best continue to be carried on wholly by this agency of proved efficiency, an agency which was no doubt considered best suited to cope with the then unprecedented conditions which brought to the stockyard live stock in stupendous quantities, to feed a world at war. In those crucial months the basic live stock and packing industry could not well be hampered by tie-ups and confusions at the point of convergence in the great Chicago market of the many railroads bringing in live stock by the thousands of cars daily. The extraordinary conditions required extraordinary facilities to meet them. A unified and continuous unloading of these tremendous stock receipts, and their intelligent handling and disposal, manifestly conferred upon shippers as well as line-haul carriers an advantageous service more effective and satisfactory than if undertaken by each of the several line-haul carriers for the live stock which it carried.

That the transportation of live stock does not impose on the carrier all the responsibilities attendant upon the carriage of goods is logical, and has been distinctly recognized. North Penn. R. R. Co. v. Bank, 123 U. S. 727, 8 S. Ct. 266, 31 L. Ed. 287; Covington Stock-Yards Co. v. Keith, supra. The reasonable necessities of transportation at a given place or time may be entirely different from those of another place or time.

Harking back to the conditions under which this service was rendered, we cannot but conclude that the special benefit of the stockyard unloading service which then accrued to the shipper or consignee, at largely added cost to the Stock Yard Company, was properly the subject of an increased unloading charge outside of and beyond that which was otherwise included in the line-haul carriers' published transportation rates, very much as in "Dunnage Allowances, 30 I. C. C. 538," referred to in the opinion herein of the Commission in 52 I. C. C. 209.

Appellants earnestly urge that the collection of this charge was a tort, and that all participants therein were joint tort-feasors. We cannot believe that the Stock Yard Company committed a tortious act in collecting and receiving its tariff charge, the failure to collect and receive which would have been a breach of its statutory duty. Nor

626

do we understand how the Director General of Railroads became a tort-feasor through his continuing the prior practice of receiving from the Stock Yard Company the entire rate, including the additional loading and unloading charges, and then turning back to the Stock Yard Company that part of the total charge to which it was entitled. Particularly is this so when there is no pretense that either the charge itself or the entire rate including this charge was excessive. But even if technically to be considered a tort, under all the circumstances, so far as the record discloses, it was at most damnum absque injuria.

The judgment awarded costs against appellants. Concededly this contravenes the statute (§ 16 (2), Tit. 49, U. S. C., 49 USCA § 16 (2), which provides "that the petitioner shall not be liable for costs in the district court nor for costs at any subsequent stage of the proceedings unless they accrue upon his appeal."

The judgment should be modified by eliminating therefrom the award of costs in the District Court. The District Court is directed to make such modification, and, as so modified, the judgment is affirmed, with costs of this appeal against appellants.