SOUTHERN RY. CO. v. GREENSBORO ICE & COAL CO. et al.

(Circuit Court, E. D. North Carolina. December 16, 1904.)

1. INTERSTATE COMMERCE—REGULATION—RESTRICTION ON POWERS OF STATES.
    Car loads of coal shipped from one state into another remain subjects of interstate commerce until delivery to the consignee, and an order of a state corporation commission directing the railroad company to place the cars on a certain track for unloading, as requested by the consignee, is without jurisdiction, and void, as an interference with interstate commerce.

2. JURISDICTION OF FEDERAL COURT—SUIT AGAINST STATE COMMISSION.
    A suit against a state corporation commission to enjoin the enforcement of an order alleged to be void as an interference with interstate commerce in violation of the federal Constitution and laws is not one against the state, and is within the jurisdiction of a federal court.

3. SAME—ENJOINING STATE BOARD.
    The North Carolina Corporation Commission, although made by the statute a court of record, is, in the exercise of many of the powers vested in it, merely an agent of the state, and may be enjoined by a federal court as to acts which are not judicial in character.

In Equity. Suit for injunction.

W. A. Henderson, C. B. Northrop, and F. H. Busbee, for complainant.

R. D. Gilmer, Atty. Gen., and R. H. Battle, for N. C. Corporation Commission.

E. J. Justice, for Greensboro Ice & Coal Co.

PURNELL, District Judge. This is a bill in equity to enjoin the defendants from bringing suits for penalties and damages by reason of the refusal of the complainant to place upon the trestle of the defendant ice and coal company four certain cars, and a failure to comply with the order of the defendant commissioners of the North Carolina Corporation Commission to so place the said cars. The bill coming on to be heard, after argument by counsel, a restraining order was entered, and the same referred to the standing master to find the facts. The following, omitting what is deemed unnecessary, are, in substance, the facts as found by the master:

The Southern Railway is a corporation created by and existing under the laws of the state of Virginia, and is a citizen and resident of the said state. All the defendants are citizens and residents of the state of North Carolina. The right of the Greensboro Ice & Coal Company, or of an individual shipper or consignee, to have cars transferred and switched upon his private sidings or spur track, irrespective of the rules and regulations of the Southern Railway Company, involves the right of the Southern Railway Company to conduct its business, both state and interstate. If all shippers or

¶ 2. Federal jurisdiction of suits against states, see note to Tindall v. Wesley, 13 C. C. A. 165.

¶ 3. Federal courts enjoining proceedings in state courts, see notes to Garner v. Second Nat. Bank, 16 C. C. A. 90; Central Trust Co. v. Grantham, 27 C. C. A. 575; Copeland v. Bruning, 63 C. C. A. 437.

consignees in North Carolina had the right to have cars switched and placed according to their orders, and irrespective of the rules and regulations of the Southern Railway Company, it would entail a loss to the Southern Railway Company much in excess of $2,000. The right of the Southern Railway Company to conduct and manage its interstate business at Greensboro, N. C., and various stations in the said state, amounts in value to many thousands of dollars, far in excess of $2,000. The right of the Southern Railway Company to conduct its interstate business at Greensboro, to dispose of its rolling stock and distribute it, and to refuse to permit its cars to be placed on private sidings, according to its reasonable rules, is of great value to them, and amounts to many thousands of dollars far in excess of $2,000. Every day between the hours of 12 noon and 1:30 the Southern Railway Company has, arriving at Greensboro, N. C., seven mail trains and four trains carrying interstate freight. All of these trains arrive about the same time, and if the Southern Railway was obliged to get a car out of one of these trains, or was obliged to place a car on a certain siding at a certain time between these hours, under the orders and directions of the private shipper, or under the orders and directions of the North Carolina Corporation Commission, and irrespective of its own reasonable rules and regulations, it would mean detention and delay and damages not only to interstate freight, but the United States mail and passengers. Ordinarily, during other hours, except in cases of unusual congestion, which rarely occurs, cars can be placed on the said spur track and trestle within 24 hours of their arrival, without interfering with the business of the railroad company, either state or interstate; and it does not inconvenience the railroad, or interfere with its track or business, to place cars on the said spur track and trestle, any more than it would on any other spur track—that is to say, that this can be done in due course of business, and under reasonable rules and regulations of the company. In the event of congested condition by reason of the number of flat cars shipped to Greensboro, such condition would be relieved to some extent by using the said spur track or siding of the ice and coal company for the purpose of placing the said company's cars on the siding. The Greensboro Ice & Coal Company does a business which involves a shipment to it of about 200 cars per year, according to the testimony. It pays freight in the neighborhood of $15,000 per year. The amount of the profits of the ice and coal company does not appear in evidence, but the business transacted largely exceeds the sum of $2,000, the freight paid by the company being about $15,000 per year. If the ice and coal company had to unload all of its freight on the team tracks other than the siding and trestle in question, the said company could not profitably conduct its business. The amount of loss or inconvenience to either party by actually placing the four cars in question upon the side or spur track or by failure to place the same would not and did not amount to $2,000.

The North Carolina Corporation Commission has not, so far as the testimony discloses, attempted to interfere with the business

or management of the plaintiff company, except to the extent of requiring it to place the said four cars on the defendant company's siding, nor has the defendant company asked any further interference with said business management. The extent of said interference will more particularly appear by the order made by the North Carolina Corporation Commission. On October 31, 1903, the North Carolina Corporation Commission, upon complaint of the said ice and coal company, made an order requiring the Southern Railway within 48 hours after service of said order to place four cars of coal consigned to the Greensboro Ice & Coal Company on the private siding or spur track of the Greensboro Ice & Coal Company at Greensboro, N. C. One of said cars belonged to the Southern Railway Company, two were the property of the Norfolk & Western Railway Company, and one the property of the Chesapeake & Ohio Railway Company. On all of said four cars, except the one belonging to it, the Southern Railway Company was obliged to pay the railway companies owning the cars a per diem of 20 cents per day for each day such car remained on its line after the expiration of the first three days subsequent to the receipt of the car on the rails of the Southern Railway Company. Each foreign car which remains on the rails of another railroad company exceeding 30 days subjects the delinquent road to a penalty of a dollar per day until the car is returned to the road owning it. Three of the cars—those not owned by it—were on the rails of the Southern Railway Company exceeding three days from the time they were received, and a per diem of 20 cents per car had to be paid by the Southern Railway Company. The four cars comprehended by the said order of the North Carolina Corporation Commission were loaded with coal in the states of Pennsylvania, West Virginia, and Tennessee, respectively, and each of said cars of coal was transported over lines of the Southern Railway Company and connecting lines as one continuous uninterrupted journey through several different states to Greensboro, N. C. At the time said order of said North Carolina Corporation Commission was made, and both prior and subsequent thereto, the said coal remained loaded on the cars in the original unbroken package in which it began its continuous uninterrupted journey from the states of Tennessee, West Virginia, and Pennsylvania, and said coal and said cars were still in the possession of the Southern Railway Company, undelivered to consignee.

It is admitted in the answer, and also upon the taking of testimony, that said four cars loaded with coal as aforesaid, and transported as above mentioned, were and are interstate commerce.

The Southern Railway Company declined to switch these cars upon the private siding or trestle of the ice and coal company because it was claimed the latter company had refused to comply with the rules of the North Carolina Car Service Association, adopted by the Southern Railway Company to expedite the use of equipment in the public interest. The general rules adopted by the Southern Railway Company, known as "Rules of the North Carolina Car Service Association," are reasonable, and their object is,

not to produce revenue, but to facilitate the distribution of equipment and the expeditious handling of freight, and to that end to enforce an equal, reasonable, and uniform charge for the detention of cars when the cars are detained over the free time prescribed in the rules. They have had this effect, and have operated and do operate to the mutual benefit of the railroads and the public, and have reduced the average time of detention of cars from five days to one and one-fifth days, and have increased the number of cars available for public service. The terms and provisions of these rules of the North Carolina Car Service Association, adopted by the Southern Railway Company, were well known to the ice and coal company, which has done business under them for some years. Among the provisions of said rules were the following:

"Sec. 1 of Rule 2. On commodities for unloading or loading forty-eight hours, two days free time will be allowed, except that Sec. 2, seventy-two hours will be allowed for unloading fertilizer, and the following commodities when in bulk only: cotton seed, cotton seed hulls, coal, coke, fertilizing material, grain, lime, tan-bark, and dressed lumber in box cars.

"Sec. 2 of Rule 2. In case consignees or consignors refuse to pay, or unnecessarily defer settlement of bills for car service charges, the railroads shall, upon notice to that effect from the manager, refuse to switch any cars for such consignees or consignors, until such charges are paid."

The Southern Railway Company, on October 12, 1903, issued a notice to the ice and coal company that commencing at 12 noon, October 17, 1903, it would only deliver cars on the public team tracks of the Southern Railway Company at Greensboro, N. C. After October 12, 1903, and subsequent to receiving said notice, the ice and coal company ordered said four cars of coal, and caused them to start from their respective points of origin, and could have countermanded said order. Said four cars of coal came on the yards of the Southern Railway Company at Greensboro, N. C., after October 17, 1903. Proper notices were sent the said ice and coal company of their arrival, and the cars were marked up to the public team tracks of the Southern Railway Company at Greensboro, and actually placed thereon, and the delivery tendered to the ice and coal company. The ice and coal company declined to receive or unload said cars at any other point whatsoever except on their private siding or trestle. The refusal to unload said cars was not because of any defect in the notices, but because the ice and coal company required and demanded that the said cars should be placed on their private track or trestle. Said four cars of coal reached Greensboro, N. C., between October 18 and October 22, 1903, and were placed on the public team tracks and there remained for the purpose of being unloaded by the ice and coal company until November 2, 1903, when they were removed because they were blocking the team tracks and interfering with the public use thereof.

According to the rules of the North Carolina Car Service Association, adopted by the Southern Railway Company; 72 free hours' time is allowed for unloading cars, and these cars remained on the team tracks much more than 72 hours from the time they arrived (October 18 to 22, 1903) and the 31st of October, the date of the commission's order, and therefore, when such order was passed, demurrage was actually due upon these four cars, "provided that the court shall hold upon the facts

that it was not the duty of the Southern Railway Company to place the said cars upon the said side track or trestle of the said ice and coal company, as it was requested to do." No demurrage has been paid by the ice and coal company. The said ice and coal company had first refused to pay freight on these four cars of coal unless the same were placed on their private siding. On October 27, 1903, upon receipt of the letter of the North Carolina Corporation Commission dated October 26, 1903, and on account of said letter, the ice and coal company paid the freight on the four car loads of coal. Said four cars having reached Greensboro between October 18 and 22, 1903, and 72 hours' free time having expired long prior to October 27, 1903, demurrage was due on said cars on October 27, 1903, the date the freight was paid, "provided the court shall hold upon the facts that it was not the duty of the Southern Railway Company to place the said cars upon the siding or trestle of the ice and coal company, as it was requested to do." The notice of October 12, 1903, declining to switch cars to the private siding of the ice and coal company, and the refusal to deliver the four cars in question was alleged to have been based upon the refusal of the ice and coal company to "comply with car service regulations," etc. The alleged refusal to comply with the said rules consisted in the refusal of the ice and coal company to pay an account for demurrage of some $146 claimed to be due on certain 13 cars previously delivered. This claim was denied on the part of the ice and coal company. The ice and coal company was solvent, and was so known to the Southern Railway Company. When the four cars arrived, the work upon the siding and trestle had been completed, and they were in good condition for delivery and for unloading of coal, and were so known to the agents of the railway company which had control of placing cars. At that time the Southern Railway could have switched said cars on the siding within 24 hours after their arrival, and the ice and coal company could have unloaded the coal, and left them to the control of the railway company, within three hours after they were so switched respectively. It would in no way have interfered with the prompt, economical, and easy handling of this or other freight or business for the Southern Railway to have placed the four cars as requested. The trestle can, in the ordinary course of business, be used by the Southern Railway Company for unloading freight consigned to the ice and coal company with ease, and such freight can be unloaded there in less time than would be required in unloading it elsewhere. It is easier to unload coal from the trestle of the ice and coal company than from the public team tracks.

About 1890 the ice and coal company leased the property upon which its plant is situated, and which embraces its yard, of one W. D. McAdoo, who owned and now owns the same. The lease was renewed in 1899, and is still existing. At the time of the first lease the Cape Fear & Yadkin Railroad Company had a short spur track extending from its main 'track to within three or four feet of the yard of said ice and coal company. It could accommodate only one car so as to be conveniently unloaded. In the spring of 1891, or some time thereafter, the said track was extended within the yard of the ice and coal company, so that in 1895 it had reached a point very near the boilers of said company. The extension was made by the Cape Fear & Yad-

kin Valley Railroad Company at its own expense, and upon oral agreement, at the instance of the said ice and coal company, and for its accommodation. The terms of this agreement do not appear. In 1895 it was further extended by the ice and coal company. This was all done before the renewal of the lease of McAdoo and the purchase of the Cape Fear & Yadkin Valley Railroad Company by the Southern Railway Company. Since the extension of said track into the yard of the ice and coal company the Cape Fear & Yadkin Valley Railroad Company, and its successor, the Southern Railway Company, have been delivering cars over said track to the yard of the ice and coal company. That part of the spur track outside of the yard of the ice and coal company had also been used by the railway company for the purpose of shifting their cars, for holding dead cars, and, in some instances, unloading for persons near the said track. There has been no objection to such use of said track by the ice and coal company. The extension from the railway's right of way to the yard of the ice and coal company passes over land belonging to W. D. McAdoo and the Guilford Rolling Mills, and neither the Southern Railway Company nor the ice and coal company have any legal right to use the same, there being no written grant of easement or license; the ice and coal company having only a right, under its lease from McAdoo, to ingress and egress for ordinary vehicles. The use of said land has been by sufferance of the owners, and the said owners have made no objection, and taken no steps to prevent such use, and such use has been and now is permitted, though once or twice the secretary of the said mills has complained of it as a nuisance, and McAdoo has threatened to have compensation made him. The ice and coal company desired to construct a trestle within its yard for the more convenient unloading of cars, and this involved the raising of the existing track and the moving of it, or a part of it, a short distance—10 or 12 feet—south. There was a grade of several feet from where, or near where, the track left the railway right of way to the proposed trestle, so that the track was not only to be elevated within the yard, but also outside of it, the proposed removal still leaving the track to pass over the land of other parties above named. Application to make these changes was made to the Southern Railway Company about the 1st of September, 1903. The permission was granted, the agreement being that the ice and coal company should do the entire work at its own expense, including the grading, etc., except the removal and laying of the track, which the Southern Railway Company agreed to do or supervise, when the work was ready, using their own iron (the same which was already there), and its spikes, etc. Plans were exhibited and agreed to, and the work commenced about the 8th or 9th of September, 1903, and completed about the 29th or 30th of September, 1903. There was no written or express contract on the part of the Southern Railway Company in respect to the use of the said track, but considering all of the circumstances induces the master to find "that there was an implied agreement that said track should be adopted and treated, so far as the ice and coal company was concerned, as a track for the delivery of its cars upon its trestle, under the reasonable rules and regulations of the said Southern Railway Company; this implied agreement to continue so long as the said track was main-

tained by mutual consent." It is admitted that during the period between the commencement and the completion of the work no cars could be received or unloaded within the yard of the ice and coal company. It is the custom of the Southern Railway Company to construct private sidings for the use of shippers of large quantities of freight; but it is not the policy of the said railway to do so except under contract, the printed form of which is in evidence, such contract containing a provision securing the acquisition of necessary rights of way, etc. There was a standing order on the part of the ice and coal company that its cars should be delivered upon its yard. There appears to have been no such standing order in respect to the delivery of cars on the spur track outside of said yard, except the request in respect to 13 cars arriving after the beginning and before the completion of said work. There was no contract to deliver cars on the track outside of the yard. This standing order was given to the agent after the track had been torn up in the yard, and about the time of the beginning of the construction of the trestle. In respect to the said 13 cars it is claimed by the ice and coal company that it designated this spur track outside of the yard as a proper and accessible point of delivery, and that the complainant, failing to comply, could not claim demurrage because of the failure or refusal of the said ice and coal company to receive them at any other point. From the 9th to the 14th of September the said spur track was occupied by the Woodruff & Townsend cars—one of them from the 9th to the 11th, and the other from the 12th to the 14th. The ice and coal company did not have the exclusive right or priority to have cars placed and unloaded on said spur track. One of the thirteen cars arrived on September 9, 1903, and two of them on September 10, 1903, while the track was so occupied. The remaining ten arrived between the 14th and 19th of September, 1903. The track had been spiked down on the 14th of September by the railway company, as unsafe for their equipment, etc. After this date the preponderance of testimony establishes that no other cars were put upon said track until the completion of the work on the 29th of September; certainly it was not generally used for the purpose of delivery and unloading. The work commenced by excavating inside of the yard of the ice and coal company near the fence, and the rails were torn up inside, and also several feet outside, of the fence. After a week or more, the building of an embankment or "fill" was commenced outside of said yard, and some feet south of the existing track, preparatory to a removal of the rails on it to a greater elevation, the dirt being taken from the excavation inside of said yard. On the 14th of September the end of the track within several feet of the fence had been "jacked up," leaving the sills hanging. There was testimony tending to show that about or after the 14th the "jacking up" or removal of the dirt from under the rails extended some distance along the spur track, making it dangerous to put cars upon it. There was a fall of some feet towards the yard, necessitating the use of brakes, or "choking"; the new track, when completed, being a reversal of this grade some distance in order to meet the necessary elevation of the trestle. The work was being done by the ice and coal company, under its supervision and control, by its contractors; the Southern Railway Company having nothing to do with it, except to shift the rails

to the new track when all was ready. There was sufficient space on the track which had not been removed to accommodate two cars from where the track was first torn up several feet from the yard of the ice and coal company, and it was possible, up to within two or three days of the completion of the work, for the Southern Railway Company to have placed and unloaded cars upon it. In not using the said track for delivery and unloading of cars within that period—that is, from the 14th of September to within two or three days of its completion—the Southern Railway Company exercised a reasonable degree of prudence in respect to the safety of its equipment and the orderly conduct of its business. The ice and coal company requested the Southern Railway Company to place these cars on the spur track outside of the fence, and designated no other place for delivery. The Southern Railway Company, after such request and designation, did not actually place any of the thirteen cars, except perhaps one or two, at an accessible point of delivery. The request was not for each car, but a standing order given to an agent of the Southern Railway Company, and but once. The ice and coal company never designated any other point except upon the said spur track. There were other team tracks of the Southern Railway Company where the unloading of coal would have been feasible (and the Greensboro Gas Company and many others unloaded coal from them), though not as convenient and inexpensive as the said side track. The unloading on the team tracks would render the business of the ice and coal company unprofitable. There were several coal bins and chutes on the public tracks, but these could not always be relied upon, owing to the demands of other shippers. The bins were filled at the time covered by this controversy. The notices of the arrival of all of said cars did not contain the weight or amount of charges.

The North Carolina Corporation Commission threatened to institute suits against the Southern Railway Company for heavy penalties on account of any failure to obey the order of October 31, 1903, made by said commission. The said ice and coal company threatened to institute suit against the Southern Railway Company for heavy penalties and damages on account of failure to obey said orders. There does not appear to be any substantial conflict of testimony as to the nature of the proceedings had before the North Carolina Corporation Commission. It appears that on the 20th of October, 1903, a letter from M. W. Thompson, on behalf of the ice and coal company, addressed to the said commission, was received by them. It was in the form of a letter, and the formal requirements of the rules of practice of said commission as to sections, the numbering of the same, etc., were not observed. The commission treated the letter as a complaint, but did not serve any formal notice upon the Southern Railway Company or its agents. On the 26th of October, 1903, the commission "phoned" the manager of the Car Service Association to come to its office. The answer was that he was not in the city, and the commission then requested that he come to the office of the commission upon his return. Some days after, the first vice president of the Southern Railway Company visited the office of the commission on other business, and after this was concluded this matter (the subject of Mr. Thompson's letter) was mentioned to him. On the return of the manager of the Car

Service Association he went to the office of the commission. The letter of Mr. Thompson was read, or its contents made known to him, and the matter was discussed. Then follow conversations which took place with the Corporation Commission, which are not deemed pertinent or competent testimony. The proceedings in the Corporation Commission "were not in conformity with the rules of practice of the Commission, and the Commission did not follow them strictly except in formal matters." No witnesses were sworn in this matter, nor any issue joined by a pleading, nor any other hearing, except in a conversational way first with one and then another representative of the different corporations. On November 3d exceptions were filed to the order of the Corporation Commission. The hearing of these exceptions was had on November 12, 1903, at Greensboro, when witnesses were examined, and arguments made by counsel. On December 10, 1903, the commission made an order overruling the exceptions.

To the report of the standing master complainant filed 12 exceptions. Defendants filed no exceptions.

The fifth exception is to the finding of the master that, had the $146 demurrage been paid, the four cars in question would, in the opinion of the master, have been delivered on the trestle of the ice and coal company as requested, and refusal to so deliver was solely on that ground. This exception is sustained.

Twelfth exception is to the findings of the master which relate in any way to the 13 cars which arrived in Greensboro between the 9th and 19th days of September, 1903. All testimony in relation to this finding was objected to and motion made to strike out said testimony, and the exception is now sustained, as the finding is irrelevant, and it is shown in the testimony that to have switched the 13 cars on the siding would have been dangerous to the equipment of the railroad company.

The $146 demurrage is not the question at issue in this cause. It may have been the origin of the litigation, but illustrates the truism "that large oaks from little acorns grow." This was a suit to restrain threatened irreparable wrong, and a multiplicity of suits for the penalties under the North Carolina statutes for noncompliance to the orders of the Corporation Commission. These penalties are matters of statute—$500 per pay—and involve much more than $2,000, if suit should be entered against the complainant for every day it has refused to obey the orders of the Corporation Commission made herein, and to recognize its right to interfere with interstate commerce.

The other exceptions, except as noted above, are deemed immaterial. The cause was referred to the master to find and report the facts, which order, after hearing testimony and asking counsel to signify in writing what facts they desired found, he has fully complied with in an able and satisfactory manner. It is admitted that the four cars loaded with coal, the basis of the whole controversy, were interstate commerce. This is a fact. They were interstate commerce, and there is no controversy in regard thereto. Being interstate commerce, the question naturally arises, when did these particular cars lose their character in this respect, over which

the North Carolina Corporation Commission has no jurisdiction, as recognized in the act of the Legislature creating that body? Until it ceased to be interstate commerce, Congress having legislated and assumed to regulate such commerce under the provisions of the Constitution, no state regulations can apply. G. C. & S. F. R. Co. v. Hefley, 158 U. S. 98, 15 Sup. Ct. 802, 39 L. Ed. 910; G. C. & S. F. R. Co. v. Miami S. S. Co., 86 Fed. 407, 30 C. C. A. 142; I. C. C. v. C. B. & Q. R. Co., 186 U. S. 320, 22 Sup. Ct. 824, 46 L. Ed. 1182. An article of interstate commerce remains wholly free from such state control as long as it is in the original package. Leisy v. Hardin, 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128; Austin v. Tenn., 179 U. S. 343, 21 Sup. Ct. 132, 45 L. Ed. 224; McGwigan v. R. R., 95 N. C. 428, 59 Am. Rep. 247; Emert v. Missouri, 156 U. S. 321, 15 Sup. Ct. 367, 39 L. Ed. 430; Scott v. Donald, 165 U. S. 102, 17 Sup. Ct. 265, 41 L. Ed. 632; Rhodes v. Iowa, 170 U. S. 412, 18 Sup. Ct. 664, 42 L. Ed. 1088; Schollenberger v. Pennsylvania, 171 U. S. 12, 22, 18 Sup. Ct. 757, 43 L. Ed. 49. In the cases cited above from 95 N. C., 59 Am. Rep., the opinion was delivered by the chief justice, in which he says:

"State interference with interstate commerce is absolutely forbidden, and the failure of Congress to take any action in the premises is an indication that such commerce shall remain unfettered and free, subject only to the common law. Passenger Cases, 7 How. 286 [12 L. Ed. 702]; Hall v. De Cuir, 95 U. S. 485 [24 L. Ed. 547].

"We do not undertake to venture upon the field traversed by the court further than to say that the consequences of an opposite view that permits interfering by state legislation would be mischievous in the extreme. If one state may interfere, so may every other through which the freight is to be carried, in respect to its own chartered companies, and a succession of hostile enactments might cripple and so embarrass the roads in carrying out the contract as almost to destroy such commerce, and deprive the country of those beneficial arrangements for transporting from distant points so general in use, and so conducive to the nation's prosperity and business. The former is therefore wisely committed to a single body, whose regulations may be harmonious and self-consistent."

But Congress has by legislation undertaken to regulate the matter by the act creating the Interstate Commerce Commission. Having so legislated, the state could not legislate on the subject.

In Rhodes v. Iowa, above cited, Justice White delivering the opinion of the court, it was held in an able discussion of the question:

"Moving such goods in the station from the platform on which they are put on arrival to the freight warehouse is a part of the interstate commerce transportation."

In other words, that interstate freight retains its character as such until the actual delivery to the consignee takes place.

It will be noted that many of the cases cited, as well as the well-known South Carolina Original Package Cases, are in regard to the introduction of intoxicating liquors or oleomargarine into states having prohibitory statutes, and after the delivery of the opinion in this case Congress passed the act of August 8, 1890, c. 728, 26 Stat. 313 [U. S. Comp. St. 1901, p. 3177], in which it was provided that intoxicating liquors should not be exempt from state statutes.

This legislation was in the interest of the police powers of the states, and conceded them the authority to regulate the introduction of intoxicating liquors, thus surrendering to the states a part of the recognized power vested in Congress; and this act has been held to be constitutional. There has been no concession of this nature in regard to other freight, such as coal, etc., and no question of the principle thus laid down that interstate commerce, except where such concession is made, retains its character as interstate commerce, and can only be regulated by Congress.

But the right of the North Carolina Corporation Commission is claimed under the police power of the state, and in the brief of counsel appears this quotation:

"The Corporation Commission then, being a constitutional body, with powers to enforce rules for the regulation of the operations of public and quasi public corporations under the laws of the state, cannot be enjoined from exercising police powers of which the execution is not in conflict with the federal Constitution, or laws made under its delegated powers. Express Co. v. R. R. Co., 111 N. C. 463, 16 S. E. 393; Bagg v. R. R. Co., 109 N. C. 279, 14 S. E. 79, 14 L. R. A. 596, 26 Am. St. Rep. 569; Martin v. Hunter's Lessee, 1 Wheat. 326, 4 L. Ed. 97; State Tax on R. R. Gross Receipts, 15 Wall. 284, 21 L. Ed. 164; Reagan v. Mercantile Trust Co., 154 U. S. 413, 14 Sup. Ct. 1060, 38 L. Ed. 1028."

It is an oversight that counsel should have overlooked N. Y. v. Miln, 11 Pet. 102, 9 L. Ed. 648, the original and leading case on this subject, and the numerous cases citing and affirming the same; what is known as the "Passenger Cases," 7 How. 286, 12 L. Ed. 702; and to have noted the exception stated in the brief "is not in conflict with the federal Constitution or laws made under its delegated powers." An examination of all the authorities cited show that this exception is uniformly made, and it seems the case at bar, conceding the principle laid down in authorities cited to be correct, falls under the exception. In the original case in 11 Pet., 9 L. Ed., which is cited in most of the other cases, and the cases cited thereunder in Russell & Winslow's Syllabus Digest, the exception stated in the brief is uniformly made, and, Congress having legislated upon this subject of interstate commerce, the state cannot legislate thereon. To do so would be in conflict with both the Constitution of the United States and the acts of Congress passed in pursuance thereof. The police power applies more particularly to passengers and to other matters which affect public health, convenience, and morality; neither of which seem to be involved in the delivery of four cars of coal brought from one state into another.

The defendant coal and ice company was not without its remedy. The Interstate Commerce Commission hears and decides just such questions as were involved in this controversy. Lawyers frequently make mistakes as to what courts have jurisdiction, which gives rise to the numerous decisions on the subject of the jurisdiction of the courts, of which the books are full. This defendant has made the common mistake of getting into the wrong tribunal, as Congress has by constitutional enactment placed in the hands of the Interstate Commerce Commission the regulation of interstate

commerce, as it has full authority to do under the Constitution of the United States.

In the case at bar the jurisdiction of this court is strenuously questioned, and was ably argued by the counsel on both sides. It is contended by defendants that this is a suit against the state, and, the state being a necessary party, the bill should be dismissed; and it should further be dismissed because the amount involved does not˜ exceed $2,000, exclusive of interest and cost. Numerous authorities are cited for the positions taken by opposing counsel. As to the contention of McNeill, Rogers, and Beddingfield that this is a suit against the state of North Carolina, the case of Scott v. Donald, 165 U. S. 107, 17 Sup. Ct. 262, 41 L. Ed. 648, in which a great many of the authorities are collated, seems to be decisive of this question. At page 112, 165 U. S., page 263, 17 Sup. Ct., 41 L. Ed. 648, the court says:

"The objections to proceeding against state officers by injunction are that it is, in effect, a proceeding against the state itself, and it interferes with the official discretion vested in the officers. The answer to such objections is found in a long line of decisions of this court. Osborn v. Bank of U. S., 22 U. S. (9 Wheat.) 739, 6 L. Ed. 204; Dodge v. Woolsey, 59 U. S. (18 How.) 331, 15 L. Ed. 401; Louisiana Board of Liquidation v. McComb, 92 U. S. 531, 23 L. Ed. 623; Cummings v. Merchants' Nat. Bank, 101 U. S. 153, 25 L. Ed. 903; Memphis & L. R. R. Co. v. Berry, 112 U. S. 609, 5 Sup. Ct. 299, 28 L. Ed. 837; Poindexter v. Greenhow (Va. Coupon Cases) 114 U. S. 295, 5 Sup. Ct. 903, 29 L. Ed. 194; Allen v. Baltimore & O. R. Co., 114 U. S. 315, 5 Sup. Ct. 925, 29 L. Ed. 201; Pennoyer v. McConnaughy, 140 U. S. 1, 11 Sup. Ct. 699, 35 L. Ed. 363; Belknap v. Schild, 161 U. S. 10, 16 Sup. Ct. 443, 40 L. Ed. 599, 602.

The opinion in the original case on this subject—Osborn v. Bank of U. S., supra—was delivered by Chief Justice Marshall, the eighth syllabus of which is.

"As the state itself cannot, according to the eleventh amendment of the Constitution, be made a party defendant to the suit, it may be maintained against the officers and agents of the state, who are intrusted with the execution of such laws."

The chief justice said in the above case:

"The objection is that, as the real party cannot be brought before the court, a suit cannot be sustained against the agent of that party; and cases have been cited to show that a court of chancery will not make a decree unless all those who are substantially interested be made parties to the suit. This is certainly true where it is in the power of the plaintiff to make them parties; but if the person who is the real principal—the person who is the true source of the mischief, by whose power and for whose advantage it was done—be himself above the law, be exempt from all judicial process, it would be subversive of the best-established principles to say that the laws could not afford the same remedies against the agent employed in doing the wrong which they would afford against him could his principal be joined in the suit."

The principle enunciated has been cited and affirmed in a number of cases, too numerous to cite. There have from time to time been dissenting opinions, but the Supreme Court has held strictly to the principle laid down by the chief justice.

It is not unnatural that a body having the powers of a corporation commission should imagine itself the state, but it is in reality

a mere agency of the state, and may, under the authorities, be restrained from executing an unconstitutional act, or doing an unconstitutional thing under a constitutional act.

The purpose of this suit is stated in the opening of defendant's brief as follows:

"The purpose of the bill is to properly enjoin the defendants the Greensboro Coal & Ice Company, McNeill, Rogers, and Beddingfield, acting as the North Carolina Corporation Commission, from bringing suits for penalties or damages against complainant because of its failure to comply with its order of the said Corporation Commission as to placing four car loads of coal transported from other states upon the spur track and trestle of the defendant company at Greensboro."

This purpose of the bill is properly stated in part. The suits were threatened, though denied in the verified answers, as shown in the evidence by a letter from the counsel of the coal and ice company, and by a letter or telegram from the chairman of the Corporation Commission, and as found by the master. These suits would involve more than $2,000. It should be added the purpose of the bill was also to enjoin the Corporation Commission from compelling the complainant to switch to a consignee's private side track irrespective of the rules and regulations of the Southern Railway Company, and deny to it the right to conduct its business, both state and interstate, which the master finds would entail a loss to the Southern Railway Company much in excess of $2,000; the right of the complainant railway company to conduct its interstate business at Greensboro, to dispose of its rolling stock and distribute it, to refuse to permit its cars to be placed on private sidings, according to its reasonable rules. The amount involved amounts to many thousand dollars, far in excess of $2,000 as found by the master.

True, the Corporation Commission of North Carolina is, in words, made a court of record, and it is conceded the Circuit Court of the United States cannot restrain a state court, but the Corporation Commission is vested with powers not judicial, some of which have been held to be legislative, some executive, and the restriction on the injunction of this court as to state courts does not apply, especially inasmuch as the acts complained of and asked to be enjoined are not judicial acts. As to these acts it is a state agency, not acting judicially.

Many interesting questions were discussed in the argument and in the briefs, which it is not deemed necessary to consider for the decision of the case at bar. From what has been said there appears all the elements necessary to give the Circuit Court of the United States jurisdiction.

The questions discussed in the argument are ignored without prejudice, and it is considered, ordered, and decreed that the restraining order heretofore entered be made perpetual. A decree will be drawn accordingly.