## KENDRICK COAL & DOCK CO. v. COMMIS-SIONER OF INTERNAL REVENUE.

Circuit Court of Appeals, Eighth Circuit.
November 7, 1928.

No. 8105.

Stanley ·B. Houck, of Minneapolis, Minn. (W. Yale Smiley and John R. Ware, both of Minneapolis, Minn., on the brief), for appellant.

Harvey R. Gamble, Sp. Asst. Atty. Gen. (Mabel Walker Willebrandt, Asst. Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and L. W. Scott, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for appellee.

Before BOOTH, Circuit Judge, and POLLOCK and DEWEY, District Judges.

BOOTH, Circuit Judge. This is a proceeding seeking a review of an order of the Board of Tax Appeals which redetermined a ·deficiency in the income tax of the Kendrick Coal & Dock Company for the year 1920. The proceeding in its initial stages was called a petition for review, later an appeal. The order of the Board of Tax Appeals fixed the deficiency of the tax at $18,804.01, the same amount as found by the Commissioner of Internal Revenue.

The record discloses that the matter was heard by the Board of Tax Appeals upon the pleadings of the respective parties and evidence introduced. Assignments of error and a portion of the evidence are contained in the transcript. There is, however, no certificate by the Board of Tax Appeals as to the completeness of the transcript, as provided by rule II of this court relating to review of decisions of the Board of Tax Appeals.

The findings of fact of the Board of Tax Appeals are as follows:

"Findings of Fact. ˋ

"The petitioner is a Minnesota corporation engaged in the wholesale coal business. It was organized June 24, 1916, with a capital stock of $50,000, divided into 500 shares of a par value of $100 each. Its entire capital stock was issued, with the exception of qualifying shares of directors, to Edward S. Kendrick, Jr. Kendrick had been engaged in the coal business for a number of years prior to the organization of the petitioner, first in Philadelphia, then in Cincinnati, and then in Minneapolis. He came to Minneapolis in 1911 and became associated with the Berwind Fuel Company as its sales manager of the Northwestern territory adjacent to Minneapolis. For about five years subsequent, and until May, 1916, Kendrick remained in this position. During this period

he became acquainted with industries in the Northwest which were large purchasers of coal, and also with various coal companies which sold coal in that territory. In May, 1916, he severed his connection with the Berwind Fuel Company, and went into the coal-jobbing business individually under the name of the Kendrick Coal & Dock Company.

"Kendrick continued his individual business for a period of about two months when the petitioner was incorporated. During this period he secured numerous orders for the sale of coal including both orders for single shipments and orders for shipments extending over a period of several months. None of the orders which were on hand and unfilled in June, 1916, provided for shipments extending beyond one year. On the organization of the petitioner, Kendrick turned over his individual coal business, including all of the unfilled orders on hand, for the entire capital stock of the petitioner.

"The books of account as of December 31, 1917, show assets and liabilities as follows:

| Assets. | | Liabilities. | |
|---|---|---|---|
| Cash | $ 22,504 45 | Accounts payable | $ 48,163 82 |
| Accounts receivable | 77,582 75 | Accrued expenses | 5,083 78 |
| Liberty Bonds | 12,000 00 | Surplus | 60,865 35 |
| Corporate stocks | 2,025 75 | | |
| Total | $114,112 95 | | $114,112 95 |

"In 1918 Kendrick was mustered into the military service of the United States and was not mustered out until April, 1919. He returned to Minneapolis and continued the conduct of his coal business.

"Owing to keen competition, Kendrick saw that if his business was to become a large business, it would be necessary for the corporation to acquire a dock at Duluth and for it to make arrangements whereby it could get coal by water transportation from the Eastern coal fields. Prior to June, 1920, Kendrick had been negotiating with certain Eastern coal interests for the enlargement of his business. These negotiations were carried on with A. W. Thompson of the Wilson Transit Company and F. E. Taplin of the Cleveland & Western Coal Company. In May, 1920, at a special meeting of the stockholders of the petitioner, its officers were authorized to enter into an agreement with the above-named individuals under the terms of which the petitioner was to agree in consideration of $50,000 of the stock of the Inland Coal & Dock Company (corporation to be formed) to convey to Thompson and Taplin acting for and on behalf of such corporation, 'all the office furniture and fixtures, office supplies and equipment, also the good will and all of the benefits to be derived in the way of profits from the contracts which this corporation has for the purchase or sale of coal, and the contracts themselves, profits in which are estimated at $40,000 by the officers of the company, and it being understood that the purchaser is to assume all liabilities or losses which may arise in connection with said coal contracts.' Pursuant to such authorization, Kendrick proceeded to Cleveland, Ohio, for the purpose of entering into the agreement referred to. Objection was raised by the attorney for the Inland Coal & Dock Company to the issuance of any of its capital stock in payment for the above referred to assets of the petitioner. It was then agreed that the transfer should be made for $50,000 in cash, and that the petitioner should thereupon subscribe for 500 shares without nominal or par value of the common stock of the Inland Coal & Dock Company to be paid for in cash. This change in the plan of the transaction was agreed to by Kendrick and the petitioner and a resolution in accordance therewith was duly passed by the directors of the petitioner.

"The following is the agreement entered into between Taplin and Thompson and the petitioner by E. S. Kendrick as president under date of June 1, 1920:

"Memorandum of agreement made and entered into this first day of June, 1920, by and between A. W. Thompson and F. E. Taplin, acting for and on behalf of a corporation to be formed to take over and operate the Island Creek Coal Company's dock at Duluth, Minnesota, Parties of the First Part, and Kendrick Coal & Dock Company, a corporation of Minneapolis, Minnesota, Party of the Second Part, witnesseth:

"Whereas, a corporation is to be formed under the laws of the state of Ohio to take over and operate the Island Creek Coal Company's dock at Duluth, Minnesota; and

"Whereas, it is desirable that said dock company so to be formed shall have the benefits to be derived from the going organization of Second Party and the good will connected therewith, and also from certain contracts now held by the Second Party, and shall further secure the benefit of the services of E. S. Kendrick, now President of the Second Party:

"Now, therefore, it is agreed as follows:

"(1) Parties of the First Part agree to purchase, and Party of the Second Part agrees to sell, all of Second Party's office furniture and fixtures, supplies and

equipment, also the good will of said Company, and all of the benefits to be derived in the way of profits from the contracts which Second Party has for the purchase or sale of coal, it being understood that said corporation so to be formed shall assume all liabilities or losses to arise in connection with said coal contracts.

"(2) In full payment for said property, Party of the Second Part agrees to accept, and Parties of the First Part agree to pay, the sum of Fifty Thousand Dollars ($50,000.-00) in cash.

"(3) It is understood between the parties that while said coal contracts are not to be assigned or transferred to the new Dock Company, nevertheless, from and after the date hereof, all operations of Second Party in connection with said contracts are for the sole use and benefits or loss, as the case may be, of said new Dock Company.

"(4) Party of the Second Part agrees upon request to execute any and all papers necessary or proper to effect the transfer of the property hereby purchased by Parties of the First Part, it being understood that said transfer shall be made to the corporation before mentioned when duly organized. All physical assets covered by this agreement of purchase and sale shall be transferred free of liens or encumbrances of any sort.

"(5) It is understood that it is part of this agreement, supported by the consideration herein named, that the corporation to be formed shall employ the said E. S. Kendrick as Vice President in charge of sales and management of the Duluth Coal Dock and of the Northwestern business of the corporation, at a salary of Fifteen Thousand Dollars ($15,000.00) a year and expenses, said employment to continue so long as said E. S. Kendrick shall retain his stock ownership in said corporation.

\* \* \* \* \*

"A bill of sale or assignment was then executed by the petitioner, in which it transferred to the Inland Coal & Dock Company its office furniture and fixtures, good will and all the profits to be derived from certain described contracts of the petitioner for the sale of coal. The contracts were 35 in number, had all been acquired by the petitioner subsequent to January 1, 1920, and were for the sale of 174,850 tons of coal. None of the orders or contracts on hand at that time were included in the orders or contracts transferred by Kendrick to the petitioner upon its organization in 1916. None of the accounts receivable or cash in the treasury of the petitioner were transferred to the Inland Coal & Dock Company. The surplus of the petitioner at the date of transfer was between $60,000 and $70,000.

"A check of the Inland Coal & Dock Company for $50,000 was on June 12, 1920, delivered to the petitioner as the consideration for the transfer. On the same date the petitioner issued its check for $50,000 to the Cleveland & Western Coal Company which had advanced the original subscription to the stock of the Inland Coal & Dock Company in payment for 500 shares of the common stock of the last-mentioned company. The checks were passed simultaneously.

"The Inland Coal & Dock Company was organized on June 1, 1920, with an authorized capital stock of 4,000 shares of preferred stock of a par value of $100 per share, and 6,000 shares of common stock of no par value. All of the common stock was subscribed for at $100 per share. The petitioner acquired 500 shares in the manner above described. It also purchased 700 shares giving its note for $70,000 in payment therefor, $60,000 of the principal being paid as its accounts receivable were collected. E. S. Kendrick, Jr., individually subscribed for 600 shares of the stock at $100 per share. The balance of the common stock was subscribed for by the Cleveland & Western Coal Company and the Wilson Transit Company. The company immediately acquired the dock of the Island Creek Coal Company at Duluth. The certificates of the common stock issued provided that the transfer of them was subject to the provisions of the 'Code of Regulations' of the company and that the shares of stock were 'accepted and held subject to all provisions of the Code of Regulations and to the designations, preferences and voting powers, or restrictions or qualifications thereof, of the preferred stock, which are set forth on the reverse side' of each certificate. None of the common stock of the Inland Coal & Dock Company has ever been sold and no dividend has ever been paid by the company.

"The certificate for 500 shares of common stock acquired by the petitioner with its check for $50,000 bears date of June 12, 1920, and was made out and is in the name of 'E. S. Kendrick.' This was retained by the petitioner up to December 31, 1920. At some time prior thereto a special meeting of the stockholders of the petitioner was called, a 100 per cent. stock dividend was declared (the authorized capital stock having been increased to $200,000) and three shares of stock were issued to E. S. Kendrick for $300

in cash. The stockholders then voted to accept the offer of E. S. Kendrick to exchange 500 shares of the capital stock of the petitioner owned by him for the 500 shares of common capital stock of the Inland Coal & Dock Company owned by it. The exchange was made accordingly. The petitioner returned no income for 1920 from the transaction above described. The Commissioner added $50,000 to the gross and net incomes for 1920, as the profit therefrom. The deficiencies arise from such adjustments of the petitioner's return."

In reviewing the decisions of the Board of Tax Appeals, this court considers questions of law only. It does not review questions of fact. Avery v. Commissioner, 22 F.(2d) 6, 55 A. L. R. 1277; Royal Packing Co. v. Commissioner, 22 F.(2d) 536; Mastin v. Commissioner (C. C. A. 8), 28 F.(2d) 748.

Whether a particular finding of fact is supported by any substantial evidence is a question of law, and this question of law cannot be reviewed unless all of the evidence bearing upon it is returned. United States v. Copper Queen Mining Co., 185 U. S. 495, 22 S. Ct. 761, 46 L. Ed. 1008; Nat. Masonic Acc. Ass'n v. Shryock, 73 F. 774 (C. C. A. 8); C. G. W. Ry. Co. v. Price, 97 F. 423, 434 (C. C. A. 8); Lesser Cotton Co. v. St. L., I. M. & S. Ry. Co., 114 F. 133, 143 (C. C. A. 8); Bolen-Darnall Co. v. Hicks, 190 F. 717 (C. C. A. 8).

These rules are well established, and are recognized by the parties in the case at bar. Counsel for appellant say: "The principal, underlying question in the case is whether under the provisions of Revenue Act of 1918, sections 202(a) and 202(b), appellant realized a profit of $50,000 from the transaction of June, 1920." Counsel for respondent say: " * * * The sole question is the amount of the profit realized upon the transfer of the petitioner's assets to the Inland Company."

The conclusion of law reached by the Board of Tax Appeals in the case was that the Kendrick Coal & Dock Company realized a profit of $50,000 on the transaction of June, 1920, which is set out in their findings.

The statute which has a direct application reads as follows:

"Sec. 202.(a) That for the purpose of ascertaining the gain derived or loss sustained from the sale or other disposition of property, real, personal, or mixed, the basis shall be—

"(1) In the case of property acquired before March 1, 1913, the fair market price or value of such property as of that date; and

"(2) In the case of property acquired on or after that date, the cost thereof; or the inventory value, if the inventory is made in accordance with section 203.

"(b) When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any; but when in connection with the reorganization, merger, or consolidation of a corporation a person receives in place of stock or securities owned by him new stock or securities of no greater aggregate par or face value, no gain or loss shall be deemed to occur from the exchange, and the new stock or securities received shall be treated as taking the place of the stock, securities, or property exchanged. * * *"

Section 202 of the Revenue Act of 1918 (40 Stat. 1057, 1060).

Article 1566 of Regulation 45 (1920 Ed.) promulgated by the Treasury Department under the Revenue Act of 1918 is also pertinent:

"Art. 1566. Exchange of property and stock.—Where property is transferred to a corporation in exchange for its stock, the exchange constitutes a closed transaction and the former owner of the property realizes a gain or loss if the stock has a market value, and such market value is greater or less than the cost or the fair market value as of March 1, 1913 (if acquired prior thereto), of the property given in exchange. For the rule applicable where a corporation, in connection with the reorganization, merger, or consolidation, exchanges property for stock, see article 1567."

As the findings of fact show that the property sold or exchanged in June, 1920, was acquired after March 1, 1913, its cost is one of the facts which must be determined as a basis for the legal conclusion. The other fact necessary is the fair market value of the property received in the transaction as a consideration for the property sold or exchanged. That these two facts are necessary is conceded. Counsel for respondent, in discussing the method of determining the question of profit in the transaction, say: " * * * This in turn involves a determination of the cost to the petitioner of the assets transferred by it and the value of the consideration received in exchange therefor."

The findings of fact disclose that the property sold or exchanged by the Kendrick

Company in June, 1920, consisted of (1) office furniture and fixtures; (2) good will of the business; and (3) profits to be derived from 35 contracts for the sale of coal. What was the cost of these three separate items of property, or of all three together? A careful examination of the findings of fact reveals that there is no finding whatever as to the cost of this property.

The property received in exchange was 500 shares of the capital stock of the Inland Coal & Dock Company. What was the market value of this stock at the time of the transaction? Again, a careful examination of the findings of fact reveals that there is no finding of the market value of this stock.

It thus appears that there is no finding of either of the two facts which are indispensable prerequisites to the conclusion of law that there was a profit realized in the transaction. It is true that in the opinion of the Board of Tax Appeals which accompanies the findings, there is a discussion as to the cost of the items of property sold or exchanged by the Kendrick Company; and also a discussion as to the value of the stock received in exchange by that company; and from this discussion it would appear probable that the Board of Tax Appeals was of the opinion that the cost of the items of property sold was nothing, and that the market value of the stock received was $50,000.

■ Whether such opinion was well grounded we are not called upon to inquire. Resort may not be had to the opinion to eke out the findings of fact. Crocker v. United States, 240 U. S. 74, 78, 36 S. Ct. 245, 60 L. Ed. 533; City of Goldfield, Colo., v. Roger, 249 F. 39 (C. C. A. 8); Highway Trailer Co. v. City of Des Moines, 298 F. 71 (C. C. A. 8); Lahman v. Burnes Nat. Bank, 20 F.(2d) 897 (C. C. A. 8).

■ It is argued by counsel for respondent that the Board of Tax Appeals occupies a peculiar legal position, and that the rule that an appellate court will not look to the opinion of a fact-finding court or body to eke out findings of fact, does not apply to the Board of Tax Appeals. We are not persuaded to that view.

■ Respondent's counsel also argues that the intention of Congress, as indicated by the amendment (contained in section 601 of the Revenue Act of 1928) to section 907 (b) of the Revenue Act of 1924, as added by Revenue Act 1926, § 1000 (26 USCA § 1219), is that it is to be optional with the Board of Tax Appeals whether it shall file findings or an opinion or a memorandum. A sufficient answer to this contention is that the amendment of 1928 cannot rule the present appeal. We may add, moreover, that we do not agree with counsel's construction of that amendment when applied to cases such as the one at bar.

It would seem but just that the taxpayer in cases of this kind should be entitled to have findings made as such, so that if he deems advisable, he may clearly and distinctly challenge them individually. This he cannot fairly do if the findings must be inferred or picked out from a discussion embodied in an opinion or memorandum.

■ Finally, we do not consider it our duty to examine the evidence and make findings additional to those made by the Board of Tax Appeals. That Board is primarily a fact-finding body, and we consider it good practice that the appellate court should not, unless under very exceptional circumstances, inject itself into the field which properly belongs to that fact-finding body. Such is the rule in respect to law cases tried to the court, a jury having been' duly waived. Insurance Co. v. Folsom, 18 Wall. 237, 248, 21 L. Ed. 827; St. Louis v. Rutz, 138 U. S. 226, 241, 11 S. Ct. 357, 34 L. Ed. 941; Lehnen v. Dickson, 148 U. S. 71, 77, 13 S. Ct. 481, 37 L. Ed. 373; Packer v. Whittier (C. C. A.) 91 F. 511; United States v. Penn., etc., Dock Co. (C. C. A.) 272 F. 839; Border Gas Co. v. Windrow (C. C. A.) 3 F.(2d) 974; Wessel v. Seminole Phos. Co. (C. C. A.) 13 F.(2d) 999.

The same rule holds true as to law cases taken to the Supreme Court for review of decisions of the Court of Claims. United States v. New York Indians, 173 U. S. 464, 470–471, 19 S. Ct. 464, 43 L. Ed. 769; Stone v. United States, 164 U. S. 380, 17 S. Ct. 71, 41 L. Ed. 477; Crocker v. United States, supra. It is also true of cases coming up for review under the Interstate Commerce Act. Tex., etc., Ry. v. I. C. C., 162 U. S. 197, 238, 16 S. Ct. 666, 40 L. Ed. 940; L. & N. R. Co. v. Behlmer, 175 U. S. 648, 675, 20 S. Ct. 209, 44 L. Ed. 309; I. C. C. v. Chic., etc., R. Co., 186 U. S. 320, 341–342, 22 S. Ct. 824, 46 L. Ed. 1182; I. C. C. v. L. & N. R. Co., 190 U. S. 273, 284–285, 23 S. Ct. 687, 47 L. Ed. 1047; see I. C. C. v. L. & N. R. Co. (C. C.) 73 F. 409.

The same rule is applied in other allied classes of cases. Flint v. City of Eldon, 191 Iowa, 845, 183 N. W. 344. Furthermore, in the present appeal the evidence as a whole is not returned.

Our conclusion is that the order of the Board of Tax Appeals should be reversed as not sustained by the findings, and that the

case should be remanded with instructions for such further proceedings as may be deemed advisable not inconsistent with the views herein expressed.

It is so ordered.