## WIGGIN v. COMMISSIONER OF INTERNAL REVENUE.

### No. 2484.

Circuit Court of Appeals, First Circuit.
Feb. 11, 1931.

Melville Fuller Weston (of Powers & Hall), of Boston, Mass., for petitioner.

Andrew D. Sharpe, Sp. Asst. to Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., Sewall Key, Sp. Asst. to Atty. Gen., and C. M. Charest, Gen. Counsel, and Dewitt M. Evans, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for the Commissioner.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

ANDERSON, Circuit Judge.

This is a consolidated record of three petitions for review of decisions of the Board of Tax Appeals, grounded upon a single opinion by the Board. 19 B. T. A. 282. It involves deficiencies in the petitioner's income tax for 1922 of $6,126.52; 1923, $7,893.53; 1924, $3,905; 1925, $3,635.56.

These deficiencies arise entirely from the Commissioner's disallowance of deductions claimed by petitioner in his individual returns, on account of losses alleged by him to have been sustained, pursuant to written contracts.

The petitioner, of Brookline, Mass., had for several years prior to 1922 been president, treasurer, and general manager of the H. H. Wiggin Lumber Company. He was also president of two warehouse companies, and of a fumigating company. He devoted his entire time to the management of these four companies. Approximately one-third of his time was given to the lumber company.

The lumber company was a Massachusetts corporation, with a capital of 1,500 shares and plant and properties in Louisiana. Of the 1,500 shares, Harry H. Wiggin owned 1,015; his wife, Gertrude S., 415; his son H. Sherburne, 30; and his son Morrill, 25; George H. Damon owned the balance of 15 shares. Damon was not a member of the Wiggin family, but manager of the Louisiana

mill. Both Mrs. Wiggin and the sons had invested their own money in the stock of the company.

Prior to 1921, the company had operated at a profit. The petitioner's salary was then $9,000 per year. It owed the petitioner over $250,000 for advances. As is probably matter of common knowledge, and as appears in this record [compare Henry Russell v. Commissioner, 45 F.(2d) 100 decided November 26, 1930 (C. C. A. 1)], most commodity prices dropped severely and rapidly from late 1920 through 1921. The Wiggin Lumber Company therefore found itself operating at a loss. The stockholders other than the petitioner "could not or would not advance any more money to carry along the business during this depression." The result was that, after an earlier similar oral arrangement between the petitioner and the corporation, a written contract was made under date of November 2, 1922, under which the company employed Wiggin as its president, treasurer, and general manager for two years beginning January 1, 1922, agreeing that his compensation should be all the net profits of the corporation, and that he should pay any and all losses incurred by it in its operations. The contract also provided that if, at the end of two years, the losses paid by him to the company exceeded the compensation he had received thereunder, he might at his option extend the agreement for another year. He exercised this option; in January, 1925, a similar agreement was made for 1925.

The losses sustained by the company in 1922 were $86,547.06; in 1923, $62,306.90; in 1924, $37,264.36; in 1925, $67,823.27—an aggregate of $253,941.59. These losses were all made good by the petitioner to the lumber company. In his tax returns he claimed these losses as deductions sustained by him under section 214(a) of the Revenue Act of 1921 (42 Stat. 239), and Revenue Acts 1924 and 1926, § 214(a), 26 USCA § 955, the pertinent parts of which are as follows:

."(a) That in computing net income there shall be allowed as deductions:  *  *  *

"(4) Losses sustained during the taxable year and not compensated for by insurance or otherwise, if incurred in trade or business;

"(5) Losses sustained during the taxable year and not compensated for by insurance or otherwise, if incurred in any transaction entered into for profit, though not connected with the trade or business.  *  *  *"

The Commissioner disallowed the deductions, on the ground that they represented additional investments of capital by the petitioner in the corporation and were therefore not deductible losses. This result was affirmed by the Board of Tax Appeals, but on different grounds.

The Board quotes from the petitioner's testimony his reason for making the agreement, as follows:

"Well, the first was the fact that my stockholders could not or would not advance any more money to carry along the business during this depression and therefore feeling as they did about it, about dividends, I knowing what I supposed was much more than anybody else about the lumber business, having had experience in cost accounting and knew how lumber was bought and was manufactured, I had perfect faith in the business and felt that I would be able to pull it out with a profit each and every year. I therefore decided that it would be better for me, as I was very active in it, to advance money to take care of it. Now, I might say there were two objects; the other object would be if I made money I would have chance to pay tax, and if I didn't, why I would not. I suppose that was the two motives I had. I hoped, however, to pay taxes rather than lose money as I did."

The Board disposes of the contention that his losses under the agreement were "incurred in trade or business," saying:

"Quite clearly the business of the H. H. Wiggin Lumber Company was not the business of the taxpayer. The losses in the first instance were sustained by the H. H. Wiggin Lumber Company. By the agreement of November 2, 1922, the petitioner seeks to have the losses of that company deducted from gross income in his individual tax return. If the losses are deductible they are deductible by virtue of the agreement of November 2, 1922, and succeeding agreements covering the years 1924 and 1925. We think that in no proper sense were the losses claimed as deductions by the petitioner losses incurred by him in a trade or business carried on by himself."

It dealt with the petitioner's further contention that his losses were "incurred in a transaction entered into for profit," saying:

"The facts are that the corporation was operating at a heavy loss. It had operated at a loss for 1921, and by November 2, 1922, it was apparent that it would operate at a loss in 1922. The agreement which was entered into on November 2, 1922, was apparently for the purpose of enabling the peti-

tioner to deduct from his gross income the losses of the corporation. It is to be noted that the agreement covered a period of only two years. There is no reason to believe that the agreement was one from which the petitioner expected to realize a profit. It was rather to enable him to deduct from his own gross income the losses of the corporation. We are therefore of the opinion that the losses sustained for the years 1922 and 1923 did not result from a transaction entered into for profit. We are likewise of the opinion that the extensions of that agreement to cover the years 1924 and 1925 were made merely to enable the petitioner to deduct from his gross income the losses of the corporation. We are led to this conclusion in part by the fact that as soon as the H. H. Wiggin Lumber Company began to operate at a reasonable profit the agreements were not further extended.

"It is further to be borne in mind that the petitioner owned a large majority of the stock of the corporation and that he and his immediate family owned over 98 percent of the stock of the corporation. The corporation was entirely dominated by the petitioner and the agreements were no arm's length transactions. In M. I. Stewart & Co., 2 B. T. A. 737, we had before us the case of a stockholder who owned one-half of the stock of the taxpayer corporation and who, acting for himself and the owner of the remainder of the stock, acquired stock in another corporation and transferred it to the petitioner corporation, which credited the accounts of both stockholders with the par value of such stock. During the same year the petitioner corporation acquired directly additional shares of such stock and sold all of the stock to one of its stockholders for an amount much less than the cost thereof, who in turn delivered one-half of the stock to his co-stockholder. We held that this was not a bona fide sale upon which the taxpayer was entitled to claim a deductible loss. We said:

" ' * * * In the case of corporations sales to stockholders in all cases are subject to special scrutiny and their good faith must be unquestioned. The principle of corporate entity can not be used to cloak a transaction which is essentially a fraud upon the public revenue.'

"We are of the opinion that the same principle controls the issue in the proceedings at bar."

This result cannot be sustained. The agreement between Wiggin and the lumber company made all its operating losses his losses. During these four years, Wiggin was carrying on this lumber business almost exactly as though it had been his own personal business. Its possible profits and its actual losses were his, individually. Under the contracts he managed it, without interference or control by the board of directors. The corporation was merely entitled to an accounting of the operating results of his management; otherwise its corporate business functions were practically suspended. Under these contracts, this lumber business was, in a very real sense, Wiggin's trade and business.

The vital effect of the contracts cannot be escaped. Without these contracts, about two-thirds of the losses for the four years would have fallen upon the petitioner as a stockholder, thus diminishing the value of his stock, while leaving his notes unaffected. The contracts threw the entire losses upon his notes, leaving all the stock practically unaffected. They made the losses all his, practically and legally, as much as if he had taken over the business and run it in his own name. We hold that the losses thus incurred were Wiggin's losses, and properly deductible under section 214 (a) (4).

But if there were technical doubt as to whether, under the conditions here presented, this lumber business was Wiggin's trade or business, we think the losses thus suffered by him are deductible under section 214 (a) (5), as "incurred in any transaction entered into for profit." If and in so far as the finding of the Board against this contention is a finding of fact and not a ruling of law, it is entirely unsupported.

The finding of the Board that "the agreement covered only a period of two years" is contrary to the evidence. Under the option, unless his profits already exceeded his losses, the contract covered three years. We find no evidence to support the statement (if it be finding of fact rather than a ruling of law) that "there is no reason to believe that the agreement was one from which the petitioner expected to realize a profit." The petitioner's evidence, after an experience in the lumber business dating from 1890, that he "had perfect faith in the business and felt that he would be able to pull it out with a profit," is entirely uncontradicted; it was the ordinary attitude of fairly optimistic business men in the fall of 1922, generally justified by the subsequent prosperity.

If, as petitioner in effect says, one of his motives in making the arrangement was possibly to reduce his taxes, that motive is irrelevant. The transaction was real, not a sham. The motive or desire to reduce or es-

cape taxes is almost universal, and, if not given play through sham or fraudulent transactions, entirely legitimate. United States v. Isham, 17 Wall. 496, 21 L. Ed. 728; Bullen v. Wisconsin, 240 U. S. 625, 630, 36 S. Ct. 473, 60 L. Ed. 830; Iowa Bridge Co. v. Commissioner (C. C. A.) 39 F.(2d) 777; Appeals of Jemison, 3 B. T. A. 780, 803, 804; Seufert Brothers Co. v. Lucas (C. C. A.) 44 F.(2d) 528; Austin v. United States (C. C. A.) 28 F.(2d) 677.

The test of the validity of these contracts is not whether the motive therefor, perhaps even the dominant motive, may not have been to reduce Wiggin's income taxes; the test is whether the transaction was real, the contract valid, as between him and the corporation.

Such was the holding of this court in White v. Bingham (C. C. A.) 25 F.(2d) 837. In that case there was difference of opinion in this court as to whether there was any evidence on which the jury could find the transfer from Upton to his wife incomplete or otherwise invalid; but no difference as to the irrelevancy of the donor's intent thereby to diminish the family income taxes. On retrial of the issue of fact, before the District Court, without a jury, the same test was applied, and resulted in judgment for the taxpayer. 31 F.(2d) 574, 577, 578. To the same effect is Wehe v. McLaughlin, 30 F.(2d) 217, 218 (C. C. A. 9th).

To adopt the doctrine of the Board of Tax Appeals in this case would, by necessary implication, require us to hold invalid sales of securities, showing losses, in order to escape taxes on sales made at a profit. No such doctrine can be sustained. Compare Revenue Act of 1928, 45 Stat. 791, 814, § 104 (26 USCA § 2104), for a statement of the only sort of tax-reducing device so far condemned by Congress.

The decisions of the Board of Tax Appeals are vacated, and the case is remanded for further proceedings not inconsistent with this opinion.