**HELVERING, Commissioner of Internal Revenue, v. AMES.**

**No. 9865.**

Circuit Court of Appeals, Eighth Circuit.

June 13, 1934.

**940**

Francis W. Sullivan, of Duluth, Minn., for respondent.

Before GARDNER, WOODROUGH, and VAN VALKENBURGH, Circuit Judges.

WOODROUGH, Circuit Judge.

This is an appeal from a decision of the Board of Tax Appeals.

Respondent, together with the Empire Securities Company, owned and operated by D. R. McLennan, and the R. M. Adams Company, a copartnership, formed a syndicate to develop certain iron ore mining properties near Duluth, Minn. The properties were acquired by the Evergreen Mining Company and the Minnesota Sintering Company, two Delaware corporations. Each corporation issued 1,000 shares of non-par value stock of which respondent and McLennan owned 427½ shares each and the Adams Company 145 shares. According to the agreement for the development of the properties, respondent and his associates made large advancements to the two companies; the respondent's advances totalling $709,190.17 between October 1, 1923, and July 1, 1927. Early in 1927 the R. M. Adams Company was in default in its agreement on advances; respondent was unwilling to continue to make advances; and McLennan wished to continue the enterprise. On July 1, 1927, respondent, McLennan and the Adams Company agreed that the Adams Company should be relieved of all future payments, respondent should make additional payments sufficient to bring his investment up to $750,722.76, and that the indebtedness of the mining companies to the three contributors should be divided into various classes with the following order of priorities: Class A. New advances by McLennan. Class B. Preferences to be given by McLennan. Class C. Existing advances of the various parties made subsequent to the default of Robert M. Adams Company. Class D. Certain other preferences to McLennan. Class E. Existing advances of the three parties made prior to the default of Robert M. Adams Company. Simple interest at 6 per cent. accrued on each class of indebtedness from specified times.

Pursuant to this agreement, the respondent and his associates transferred their stock in the Minnesota Sintering Company to the Evergreen Mining Company, which was thereafter controlled and operated by McLennan, and their stock in the Evergreen Mining Company to the Empire Securities Company. The classified indebtedness referred to was thereafter carried on the books of the Ever-

S. Dee Hanson, Sp. Asst. to Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., and Sewall Key and Helen R. Carloss, Sp. Assts. to Atty. Gen., on the brief), for petitioner.

green Mining Company as its liability, and the Minnesota Sintering Company was operated as a subsidiary.

Subsequent to the agreement, McLennan made various advances with the result that at the end of November, 1927, the classified indebtedness was as follows:

| | | |
|---|---|---:|
| Class A. | Empire Securities Company.... | $ 174,000.00 |
| Class B. | Empire Securities Company.... | 174,000.00 |
| Class C. | Ward Ames, Jr................. | 307,146.10 |
| Class C. | Empire Securities Company.... | 133,146.10 |
| Class D. | Empire Securities Company.... | 174,000.00 |
| Class E. | Empire Securities Company.... | 269,576.66 |
| Class E. | Robert M. Adams Company...... | 46,692.28 |
| Class E. | Ward Ames, Jr................. | 443,576.66 |
| | Total .......................... | $1,722,137.80 |

McLennan made further advances in 1928, with the result that the classified indebtedness increased to $1,991,716.48.

The mining property was an open pit mine, the development of which consists of stripping off the overburden of soil, leaving the seams of ore exposed to be mined by steam shovels and locomotives. In May, 1927, the mines were partly developed; some 2,000,000 tons of overburden had been removed at a total cost of about $570,000. The property had been test drilled at a cost of $100,000 and some four or five million tons of ore discovered. In May, 1927, there was a large quantity of ore exposed ready for mining and a few thousand tons had been shipped. Most of the indebtedness was incurred for development purposes. The sintering plant was equipped for profitable production and sale of iron ore; it had cost about $300,000. The total investment in May, 1927, was about $1,000,000. At that time there were no large contracts for the sale of ore. The operation of the sintering plant had not been successful up to May, 1927, when a general manager, a graduate mining engineer, Mr. Perry C. Harrison, took charge of the mine. It was his particular problem to adapt a new process to the sintering plant, to improve the experimental plant, and to obtain a sales outlet sufficient to justify the size of the operation. In December, 1927, the first large order for ore was received, 85,000 tons a year for three years. The capacity of the plant was increased to 600,000 tons in 1932 from 85,000 tons in 1927. The capacity of such a mine depends upon the sintering capacity. Increased excavating would increase the ore output, and this could be done by adding another shovel.

The value of the ore has never been set up in the balance sheet. It requires a sale of 200,000 tons of ore a year to make a profit.

If the company could sell 200,000 tons of ore a year, it would take forty years to exhaust the properties. The ore reserves have increased from the original engineer's estimates during the last few years because the beneficiation process has been refined and improved so that at least 2,000,000 more tons of material on the border line will be taken out.

The items contained in the balance sheets represented cash occasioned by expenditures of money believed necessary and reasonable for the operation of the mine. These balance sheets, received in evidence (which omitted to give a value to the ore), gave the liabilities of the Evergreen Mining Company as $1,873,570.99. The assets were the same in amount, but included items to which the petitioner calls attention as not worth anything, as follows: (1) "Operating deficit" of $328,102.82; (2) loans to the Minnesota Sintering Company of $272,582.54, plus interest accrued thereon of $12,140.35. Petitioner claims the books show $147,564.78 available for the payment of class E indebtedness. But petitioner does not include in this accounting the value of the ore properties. Title to the land was not in the mining company, but it had leasehold interests.

The mining companies met their current obligations in 1927 and 1928. They never had any difficulty in getting credit in 1927, on the basis of thirty days' credit.

Since 1931 there has been no market for ore. In 1929 and 1930 the company made an operating profit, before considering classified indebtedness and interest thereon. Respondent argues that since the classified indebtedness represents advances for capital expenditures, which under normal financial organizations would not be carried as loans, but as payments toward capital, and the advancements or subscriptions to capital represented by certificates of stock, the failure to pay interest on the loans should not be considered as a failure to pay an expense of operation any more than a failure to pay a dividend on capital stock should be considered a failure to pay an expense of operation, and similarly the classified indebtedness should not be considered an indebtedness any more than the amount of issued and paid for capital stock should be so considered.

Development of the mine continued through 1928 and 1929 by stripping and laying tracks, adding equipment to the sintering plant, increasing capacity, and mining from the existing development.

In the fall of 1927, the respondent and his associates paid a visit to the mine. Mr. Har-

rison went over the situation with them and, as he testified, told them:

"I told them of the problems and difficulties the company was facing; that if I were allowed sufficient outlay to reduce the cost of mining and beneficiation, there ought to be a profit sufficient to redeem their investment; we had worked out a process that was successful, that the big part of the solution, however, depended on the price at which the ore could be sold and the quantities that could be produced and these factors are unknown to me. I knew our cost of production could be reduced, but whether we could make sales in sufficient volume so as to make a profit I did not know."

This statement was based on the current price for ore then. The market price of ore in 1923 was $5.55; 1924, $4.75; 1925 to 1928 inclusive, $4.25; 1929, $4.50 per ton.

Mr. Harrison appraised the Evergreen property for Mr. McLennan at $5,000,000 based on the profit to be expected on an output and sale of 200,000 tons per year. In the fall of 1928 Mr. McLennan declined an offer for a workout proposition on the mine which would have produced around $1,125,000 over the life of the mine. Mr. McLennan also refused an offer to exchange the property for stock in the Republic Iron & Steel Company.

The Evergreen Mining Company, as required by Minnesota law (Mason's Minn. St. 1927, §§ 2364, 2374), filed an annual sworn report to the Minnesota taxing authorities as to tonnage and analysis of the ore. For 1928, the Minnesota state tax commission found an available tonnage of 3,832,920 tons having an assessed value of $156,316. The value of the ore is ascertained (section 2374) by subtracting from the value of the ore at the place where the same is brought to the surface, the reasonable cost of separating the ore from the ore body; including the cost of hoisting, elevating, or conveying the same to the surface of the earth, and, in an open pit mine, an amount for each ton of ore mined or produced during the year equal to the cost of removing the overburden, divided by the number of tons of ore uncovered. Concerning this Mr. Harrison testified:

"The assessment of $153,000.00 is supposed to be one-half of the Commission's estimate of the present value of the profits to be made from the property after all development expenses have been redeemed. This I say on information and belief. They do not add to the value of our property because we spend $1,000,000 in stripping; the value before and after is the same. In other words,

after we return all of the investment of about $2,000,000, and all of that is paid back, then the present value, one-half of the profits to be expected by the Tax Commission equal $170,000. That is the present value of quite a sum of money when you spread it over twenty, thirty or forty years."

In December, 1927, the respondent sold to one Washburn for $500 one-half ($221,-788.33) of his class E indebtedness receivable and claimed a loss of $221,788.33 in his income tax return for 1927, which the Commissioner allowed. In December, 1928, respondent sold for $100 the remaining one-half of his class E indebtedness and thereupon deducted a loss of $221,688.33 in his 1928 return. The Commissioner disallowed the latter on the ground that the entire class E indebtedness became worthless in 1927, and therefore the sale of the remaining half in 1928 for a nominal sum did not have the effect of transferring the right to deduction from 1927 to 1928. The Commissioner determined a deficiency against respondent for 1928. Upon reviewing it, the Board of Tax Appeals reached a contrary conclusion, and this petition to review has followed.

The Board of Tax Appeals made some findings of fact. Many of the facts, if found at all, are found in its "opinion." Neither party raises any question about this. See Kendrick Coal & Dock Co. v. Commissioner (C. C. A. 8) 29 F.(2d) 559. Treating the facts as properly found by the Board, the following (embraced in the "opinion") are of importance:

"The bonafides of neither the 1927 nor 1928 sale is questioned."

"That respondent (petitioner here) does not question that the sale was an arms-length transaction."

The Revenue Act of 1928, § 23 (j), 26 USCA § 2023 (j), permits of deductions for the purpose of computing net income: "Debts ascertained to be worthless and charged off within the taxable year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts); and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt to be charged off in part."

The question presented is as to the sufficiency of the evidence to sustain the decision of the Board of Tax Appeals.

The history of the mining companies has been given at length because, while the question is whether the debt was ascertained to be worthless in 1927, that involves a consid-

eration of the then financial condition of the debtor, combined with a prophecy as to its future success. Subsequent events in the history of the company, it seems reasonable to say, could be looked at to determine whether it had been ascertained by the creditor at that time that the debt was worthless. Cf. Edson v. Lucas (C. C. A. 8) 40 F.(2d) 398 at page 406; and American Trust Co. v. Lucas, Commissioner of Internal Revenue (C. C. A. 9) 31 F.(2d) 47.

The duty of ascertainment rests upon the taxpayer, but he is not held to absolute certainty in the performance of that duty.

In Duffin v. Lucas (C. C. A. 6) 55 F.(2d) 786, 795, it is said:

"Clearly, this ascertainment must have been by the taxpayer. Sometimes the processes of the law declare a debt to be worthless. An execution returned unsatisfied, winding up the estate of a deceased debtor with no payment, a discharge in bankruptcy with the closing of the estate and no dividends—in these cases it may well be that the taxpayer must be deemed to have 'ascertained' the worthlessness when this legal demonstration occurs; but these cannot be the exclusive means. Worthlessness may exist without these tests, and the taxpayer may know it in other ways but we can see no absolute duty on the taxpayer's part to ascertain worthlessness, at his peril, during this same year when the debt becomes uncollectible by law. We think there must be, in many cases, a reasonable discretion on the part of the taxpayer, even though he knows that he cannot collect by law at that time to treat it as not entirely worthless, relying upon the good faith and good intentions of the debtor and hoping for better results next year."

It is a question whether the creditor had any reasonable expectations that the debt, or any part, would or even might be paid. Id. "But a debt cannot be written off as worthless merely because it is doubtful. Reasonable and intelligent effort must be made to determine its value, and the circumstances thus discovered must be such as reasonably to generate the belief that it is in fact worthless. Naturally no hard and fast rule can be laid down, and each case must be adjudged in the light of its own facts." American Trust Co. v. Commissioner (C. C. A. 9) 31 F.(2d) 47, 49.

It is the duty of the taxpayer to make the deduction during the year that the worthlessness of the obligation is ascertained. Stephenson v. Commissioner (C. C. A. 8) 43 F. (2d) 348.

Petitioner relies on two facts as conclusively showing worthlessness. The first is the sale of half the debt for $500 in 1927. But while such a sale might be referable to a belief of worthlessness, under the facts of this case, it is not solely to be attributed to such a cause. Mr. Ames had made large capital gains in his investments in 1927 and 1928. Offsetting these gains by a bona fide sale of his indebtedness was not forbidden by law. Even though the transaction is a device to avoid the burden of taxation, it is not for that reason alone illegal. Iowa Bridge Co. v. Commissioner (C. C. A. 8) 39 F.(2d) 777; Stimpson v. Commissioner (C. C. A. 8) 55 F.(2d) 815; Wiggin v. Commissioner (C. C. A. 1) 46 F.(2d) 743. He may have preferred the certainty of a present sale of a claim doubtful in the time of payment, if not in the ultimate amount of the amount to be collected, carrying with it the certainty of an offset to his capital gains and a minimization of income tax for 1927. The Board's decision may thus be sustained. The determination of the Board of Tax Appeals of a pure question of fact will not be examined by this court beyond ascertaining if there is any evidence to support such finding. Phillips v. Commissioner, 283 U. S. 589, 51 S. Ct. 608, 75 L. Ed. 1289; Twin City Tile & Marble Co. v. Commissioner (C. C. A. 8) 32 F.(2d) 229; Franciscus Realty Co. v. Commissioner (C. C. A. 8) 39 F.(2d) 583. It is true the facts are undisputed, but, where evidence is without contradiction, and different conclusions may reasonably be drawn therefrom, a question of fact is presented, the decision of which is as binding on an appellate tribunal as a finding on contradictory evidence. F. T. Dooley Lumber Co. v. U. S. (C. C. A. 8) 63 F.(2d) 384.

The other fact relied on is insolvency. But under no concept of insolvency has petitioner shown it. Assuming that a hopeless state of insolvency, if shown to have existed, would justify a finding of worthlessness of the debt, and this without any bankruptcy or receivership proceedings, petitioner has not shown insolvency. The books relied on are incomplete, omitting, as they do, the value of the ore in the ground as an asset. Including them, a condition of embarrassment is probably shown, but nothing approaching insolvency. The finding or conclusion of the Board is sustained by the evidence.

Its decision is affirmed.